DANIEL CARRIGG, Appellant, and THE FIRST NATIONAL BANK OF COUNCILS BLUFFS, Appellee, v. THE MECHANICS BANK OF PROVIDENCE, RHODE ISLAND, Appellant.

**Mortgages:** REFORMATION: FORECLOSURE. A mortgage cannot be
1   reformed and made to include land not originally embraced therein, and in the same action foreclosed and the equity of redemption cut off; upon reformation there must be another foreclosure.

**Estoppel.** One holding an assignment of rents from a mort-
2   gagor acquires no better right thereto as against the mortgagee than the mortgagor had, and an estoppel as against the latter applies equally to the assignee.

**Use and occupation.** An action for use and occupation is founded
3   upon a promise express or implied, and will not lie as against a disseisor, a trespasser or one who is wrongfully or tortiously in possession; the remedy in such cases is trespass and the recovery damages.

**Mortgages:** EASEMENTS. Where the owner of certain lots and also
4   an additional strip of ground adjoining erected a building covering the lots and a portion of the additional strip, a mortgagee upon foreclosure and sale under his mortgage, covering simply the building and lots, does not acquire title to the strip but simply such rights therein as are necessary to the use and

enjoyment of the building; and a conveyance of the strip by the mortgagor to another will not destroy the easement but vest title in the grantee subject to the easement.

*Appeal from Poltawattamie District Court.*— HON. A. B. THORNELL, Judge.

WEDNESDAY, APRIL 3, 1907.

REHEARING DENIED, TUESDAY, NOVEMBER 19, 1907.

ACTION to recover for the use and occupation of certain real estate. Defendant filed an answer and cross-petition against each plaintiff, in which it is asked that its title to the real estate in controversy be quieted. The trial court found that plaintiff bank was entitled to a lien upon the property until the sum of $2,124 was paid, paramount to any claim or lien of defendant; that defendant was indebted to it for the use of the property in the sum of $168, for which amount judgment was rendered, and defendant's cross-petitions were dismissed, and the cost taxed to Carrigg and the defendant. Both Carrigg and the defendant appeal; but, as defendant first perfected its appeal, it will be called " appellant."— *Reversed* and *remanded.*

*John P. Organ,* for appellant.

*Fremont Benjamin* and *A. W. Askwith,* for Carrigg, appellant and First National Bank, appellee.

DEEMER, J.— The facts in the case are somewhat complicated, and the principles of law applicable thereto difficult of ascertainment. Plaintiff Carrigg, prior to the year 1890, was the owner of three lots in the city of Council Bluffs, having an aggregate frontage of one hundred and fifty feet on Fourth street. Adjoining these lots on the north was a strip of unplatted ground seven feet in width, lying between lot 1 and lot 181 belonging to a stranger, running back to an alley common to all the lots. The lots, as well as this strip, were one hundred feet in depth. Car-

rigg learned of this seven-foot strip, and desirous of constructing a row of brick buildings, and wishing to use the same, he, early in August of the year of 1890, entered into negotiations with the owner thereof, which resulted in his obtaining a deed therefor, which deed was dated October 7, 1890. In the summer of 1890, Carrigg had the ground surveyed, and commenced the erection of his buildings, which were known as "Bancroft Terrace," upon the lots in question. The building or buildings were so designed and located upon the lots that in order to construct the same, he was obliged to use almost the entire one hundred and fifty-seven feet frontage to accommodate the same. There were bay windows and area ways on either end of the building, and the main structure itself was one hundred and fifty feet in length. In order to complete the building, Carrigg was obliged to borrow some money, and he accordingly made a written application for a loan accompanied by a note and a mortgage, describing the property as lots 1, 2, and 3 in the proper block. These were placed in the hands of a local investment company, which was constituted Carrigg's agent for procuring the money, and the amount asked for, to-wit, $20,000, was finally obtained from the defendant; the investment company being paid a commission for obtaining the loan. When the application for the loan was made, the building was described as a completed one, although, as a matter of fact, it was simply inclosed at that time. In the application for the loan, the lots were described as 1, 2, and 3, but the dimensions were given as ".one hundred and fifty-seven feet front by one hundred feet deep to the alley." The building was called "Bancroft Terrace," and described as having a frontage of one hundred and fifty feet, with bay windows and ornamental terraces at each end, renting for from $50 to $60 per month. An examiner made a report, in which he described the lots as having one hundred and fifty-seven feet frontage, and said that the building covered the entire lot frontage, with the exception of seven feet.

It should be stated, in this connection, that Carrigg erected a fence on the north side of the seven-foot strip, and that, upon the part not actually occupied by the building, he made a walk of brick and cement running along the north side or end of the building. When the defendant made its loan, it supposed that lots 1, 2, and 3 had a frontage of one hundred and fifty-seven feet. It did not know of the seven-foot strip, and did not know that the north wall of the building was over and upon part of this strip. Had it known of this fact, it would not have made the loan. The loan was made, and the mortgage executed, October 18, 1890, although not filed for record until the 25th of that month; and the indebtedness matured seven years after the date of the note. Carrigg failed to pay the taxes upon the property and the interest upon the loan, and defendant thereupon brought action to foreclose its mortgage, describing the property as lots 1, 2, and 3. This action was commenced in March, 1897, and the case went to decree some time in the fall of that year. Special execution issued, and the property was sold to defendant January 24, 1898, and in January of the year 1899 it received a sheriff's deed for the property, and went into the possession of the building and premises, and has since, through its tenants, occupied the same. It was not until some time in the year 1902 that the defendant, or any of its agents, knew that the description in the mortgage and the sheriff's deed did not cover the entire premises. After defendant took possession, it paid taxes upon all the property, including the seven-foot strip, made improvements upon the building, and paid a special assessment for paving in front of the seven-foot tract of ground. In September of the year 1892, Carrigg and wife executed a trust deed to one Sanford, conveying lots 1, 2, and 3, with other property, for the expressed consideration of $6,000. This was to secure an indebtedness then due to plaintiff bank. And in 1895 he (Carrigg) made another trust deed to Sanford for the expressed consideration of

$10,000, conveying lots 1, 2, and 3, the seven-foot strip of ground now in dispute, and other property. This was also made to secure an indebtedness to the bank. In March of the year 1895, Carrigg made an assignment to Sanford, trustee, of the rents and profits of the property that day deeded to the trustee to apply upon and as security for his indebtedness due plaintiff bank, and in March of the year 1896 he again assigned to the trustee the rents and profits from lots 1, 2, and 3, and other property, not including the seven-foot strip in dispute, as security for his indebtedness. The deed of March, 1895, was made subject to defendant's mortgage. Upon receipt of the assignment of rent, plaintiff bank collected the rentals of the entire property down to the time of the execution of the sheriff's deed to defendant. The trust deed of the year 1892 covered other property belonging to Carrigg, aside from Bancroft Terrace, the value of which was something like $40,000, covered by a mortgage of $20,000.

Early in the year 1898, Carrigg brought an action against the plaintiff bank, which resulted in a compromise between them. By the terms of this compromise, which was consummated by a written agreement under date November 10, 1902, it was found that Carrigg owed the bank $2,124, and the bank undertook to purchase certain judgments against Carrigg to pay $5,000 upon the $20,000 mortgage on Carrigg's other property, and $150 as a commission to a loan agent, and that, when the aggregate thereof, to-wit, $10,378.64, should be repaid by Carrigg, the trust deeds should be released. And the rents of all the property covered by the trust deeds were assigned to the bank as security for the payment of the amount due from Carrigg to the bank. This was all done after this suit was commenced, and after defendant had fully developed its claim to the Bancroft Terrace property in cross-bills filed by it; and the agreement of settlement provided for the conduct of this litigation. It is also shown by the testimony that the rental

value of the property is in dispute, the seven-foot strip, with the part of the building thereon considered as a part thereof, is $7 or $8 per month, when used in conjunction with the main building; and there was no rental value of the ground itself. Upon these facts, the trial court quieted title to the strip of land in dispute in defendant, as against Carrigg, found that plaintiff Carrigg was estopped from claiming any title in and to the seven-foot strip, that the plaintiff bank was entitled to judgment for use and occupation of the premises, and established a lien upon the premises to the amount of Carrigg's indebtedness to it. Carrigg appeals from the decree quieting title in defendant, and defendant from the decree in favor of plaintiff bank.

As will be observed, the litigation is due to the fact that the building, and improvements made with reference thereto, covers not only lots 1, 2, and 3, but a part, if not all,

1. MORTGAGES: reformation: foreclosure.

of the seven-foot strip. Had it not extended over and upon this strip of land, it is clear that, in the absence of fraud, mistake, or misrepresentation upon the part of Carrigg, he (Carrigg) would be entitled to a decree quieting title to the seven-foot strip; and the plaintiff bank would be entitled to a decree establishing its lien upon the property in dispute, and, perhaps, to a judgment for use and occupation of the property under the assignment of rents to it. The case is further complicated by the fact that the defendant foreclosed its mortgage and obtained its sheriff's deed upon lots 1, 2, and 3, and not upon the seven-foot strip; and these court proceedings and the sheriff's deed, under the facts here disclosed, cannot be reformed in equity. While, as we understand it, the plaintiff bank was a party to defendant's foreclosure suit, defendant in that suit was simply asking a foreclosure of its mortgage upon lots 1, 2 and 3 and this it obtained by its decree. If it be necessary to correct the mortgage in order to make it or the sheriff's deed cover the seven-foot strip, then it seems to be settled that there must be an-

other foreclosure and sale; for to create a mortgage, and to cut off the equity of redemption, at a single stroke, is so inequitable that a court of equity will not so decree. *Wilson v. Davis,* 37 Ind. 141; *Provost v. Rebman,* 21 Iowa, 419; *McKissick v. Mill Owners Ass'n,* 50 Iowa, 116; *Blodgett v. Hobart,* 18 Vt. 411.

We may, in this connection, refer again to the decree of the learned trial judge with reference to the rents of the property. Plaintiff bank has no claim thereto under its trust deeds. Its right, if it has any, is due to an assignment of the rents by Carrigg.

2. ESTOPPEL.

These were mere choses in action and not an interest in real estate, and as assignee thereof it has no greater rights thereto than the assignor had. If, therefore, as between defendant and Carrigg, defendant was the owner of the strip, and Carrigg by reason of estoppel or otherwise could not collect rents, it is difficult to see upon what theory plaintiff bank may collect them. Unless Carrigg was entitled to rents, his assignee is not entitled to them. Plaintiff bank has never foreclosed its trust deeds, and was not entitled to possession of the strip in controversy, or to the rents growing out of the same, save for the assignments to it of the rent, and, if, as between Carrigg and the defendant, there were no rents which could be collected by him as landlord, there was nothing to assign. Moreover, save for the recording statutes, if Carrigg is estopped from claiming either title or rents, the plaintiff bank is also estopped; for, as a general rule, a person claiming title under one who is estopped is also bound by the estoppel. *McCravey v. Renson,* 19 Ala. 430 (54 Am. Dec. 194); *Wood v. Seely,* 32 N. Y. 106; *Parker v. Crittenden,* 37 Conn. 148.

We may also partially eliminate another feature of the case before going to the main propositions involved. If defendant has no title under its foreclosure to the strip in dispute, or no lien upon the same, then the plaintiff bank has a superior equity to the

3. USE AND OCCUPATION.

strip in controversy, and defendant is not entitled to subrogation until it pays the claim of plaintiff bank, and this cannot be worked out in this proceeding. On the face of the records, including the court proceedings, defendant has no lien upon or claim to the seven-foot strip, and, unless it be for estoppel by record or in *pais,* plaintiff Carrigg is entitled to have his title to the strip quieted in him, and the plaintiff bank should have a decree establishing its lien, and perhaps a judgment for use and occupation of the premises. As to this last proposition, however, it is pretty well settled by authority that an action for use and occupation will not lie, if the possession is adverse, or if the possession is tortious. Such an action is founded upon a promise, express or implied, and cannot be maintained against a disseisor, a trespasser, or one who is wrongfully and tortiously in possession. The remedy in such cases is trespass, and the recovery is of damages. *Butler v. Cowles,* 4 Ohio, 213 (19 Am. Dec. 612); *Nance v. Alexander,* 49 Ind. 516; *Goddard v. Hall,* 55 Me. 579; *Weaver v. Jones,* 24 Ala. 420; *National Co. v. Bush,* 88 Pa. 335; *Fielder v. Childs,* 73 Ala. 567; *Central Co. v. Hart,* 124 Mass. 123. So that, in no event, can the judgment for rent be sustained.

The other questions relate to the decree quieting title in defendant and establishing a lien in favor of plaintiff bank. Unless defendant in some way obtained title by its foreclosure to the seven-foot strip in dispute, or unless it be found that plaintiff Carrigg is estopped from denying that it did, the decree quieting title is erroneous as to him. On the other hand, it may, under certain circumstances, be entitled to a decree against Carrigg, and yet plaintiff bank may be entitled to have its liens under its trust deeds established for want of notice. The case is rendered difficult by reason of the construction of the building in the manner in which it was erected. But for that there would be no trouble, and we have to determine what effect should be given that circumstance.

4. Mortgages: easements.

When the building was erected, Carrigg owned all the ground upon which it was placed, both the lots and the strip in dispute. So far as he was concerned, it was immaterial whether it ran over upon the seven-foot strip or not. That question only became important when he sold, conveyed, or mortgaged the lots and the strip independent of each other. This, of course, he had a right to do; but, in so doing, it becomes important to determine what passed under a deed, say of lots 1, 2, and 3. In erecting the building, Carrigg did not intend to make a complete structure upon either lots 1, 2, and 3 or the strip in controversy, and, had he sold these properties to separate individuals, there is no doubt, we think, that a grant of lots 1, 2, and 3, without more, would have carried with it an easement appurtenant or appendant to the use of so much of the seven-foot strip as was necessary for the comfortable use and enjoyment of lots 1, 2, and 3, and the buildings thereon. He owned both pieces of property at the time the building was erected, and, while for the purpose of the case, he conveyed them to different persons, his conveyance did not destroy the easements existing in favor of either estate, so long as the building exists. *Putzel v. Drovers' Bank,* 78 Md. 360 (28 Atl. 276, 22 L. R. A. 632, 44 Am. St. Rep. 298); *Dowling v. Hennings,* 20 Md. 182 (83 Am. Dec. 545).

As said in Washburn on Easements, 81: " It may be considered as settled that, on the conveyance of one of several parcels of land belonging to the same owner, there is an implied grant or reservation, as the case may be, of all apparent or continuous easements or incidents of property which have been created or used by him during the unity of possession, though they could then have had no legal existence apart from his general ownership." See, also, *John Hancock Co. v. Patterson,* 103 Ind., 582 (2 N. E. 188, 53 Am. Rep. 550), which is very closely in point. In *Lampman v. Milks,* 21 N. Y. 505, it is said:

The rule of the common law on this subject is well settled. The principle is that where the owner of two

tenements sells one of them, or the owner of an entire estate sells a portion, the purchaser takes the tenement or portion sold, with all the benefits and burdens which appear at the time of the sale, to belong to it, as between it and the property which the vendor retains. This is one of the recognized modes by which an easement or servitude is created. No easement exists so long as there is a unity of ownership, because the owner of the whole may at any time rearrange the qualities of the several parts; but, the moment a severance occurs by the sale of a part, the right of the owner to redistribute the properties of the respective portions ceases and easements or servitudes are created corresponding to the benefits and burdens mutually existing at the time of the sale. This is not a rule for the benefit of the purchasers only, but is entirely reciprocal. Hence, if, instead of a benefit conferred, a burden has been imposed upon the portion sold, the purchaser, provided the marks of this burden are open and visible, takes the property with the servitude upon it. The parties are presumed to contract in reference to the condition of the property at the time of the sale, and neither has a right, by altering arrangements then openly existing, to change materially the relative value of the respective parts.

See, also, *Reiners v. Youngs,* 38 Hun (N. Y.) 335; *Henry v. Koch,* 80 Ky. 395 (44 Am. Rep. 484); *Lebus v. Boston,* 107 Ky. 98 (51 S. W. 609, 52, S. W. 956, 47 L. R. A. 79, 92 Am. St. Rep. 333); Jones on Easements, section 129. In the latter work it is said: "Where one conveys a part of his estate, he impliedly grants all those apparent or visible easements upon the part retained which were at the time used by the grantor for the benefit of the part conveyed, and which are reasonably necessary for the use of that part."

Without further quotation from the authorities, we think that defendant, by its foreclosure proceeding, took title to lots 1, 2, and 3, with all the easements and appurtenances thereto belonging, which included the right to have the north wall of the building remain where it is, as well as all other rights necessary to the enjoyment of the building as

it was erected by Carrigg, without responsibility to him, his grantees or mortgagees, for the use and occupation of the premises.

But we do not think that defendant was entitled to have the title to the seven-foot strip quieted in it. It never obtained any title thereto under its foreclosure proceedings. All that it received thereunder was title to lots 1, 2, and 3, and the building thereon, with all easements and appurtenances thereto, and this included the right to use and occupy the building and that part of the strip which it covered, the same as it had theretofore been used by Carrigg. These rights passed as appurtenant to the mortgage and the foreclosure sale, whether specifically mentioned or not; and all that defendant is entitled to, is to have this easement established.

Plaintiff bank had notice or knowledge of this easement on account of the construction of the building upon the strip; but it had no knowledge that defendant, either as mortgagee or otherwise, was claiming title to the lot, and it is entitled to have its lien established upon the strip subject to defendant's easements thereon. Defendant is not entitled to have a decree quieting its title to the seven-foot strip, even as against Carrigg, for it is holding under a mortgage foreclosure which in no manner covers the seven-foot strip, except as to easements therein. The difficulty here is not that Carrigg may not be estopped, but with defendant's own title. It cannot have the strip included in its sheriff's deed without reformation of its mortgage, and this it cannot do without giving all parties in interest an apportunity to redeem. It is not, however, liable for rent, and the plaintiff bank is not entitled to recover any. It may have its lien established against the seven-foot strip to the amount owing it by Carrigg; subject, however, to the easement which defendant holds therein, as above stated.

Plaintiff Carrigg is not, as we understand it, asking that his title be quieted to the seven-foot strip. If he makes

any such claim, it is in a reply to the cross-petition, and not in the original petition. A careful examination of the pleadings, however, fails to disclose that Carrigg is making any claim of title to the property or that he is asking that his title, whatever it may be, be quieted.

Plaintiff bank, at the time it took its trust deed and received its assignments, did not know that defendant was making any claim to the strip in dispute, save as it might have had notice from the fact that the building extended over onto the strip, that some claim was made. But its claims were of record, and, going to that record, it would have found that defendant's mortgage covered nothing but lots 1, 2, and 3. True, when it received its last assignment in settlement of the litigation with Carrigg, it knew of defendant's claim; but, as we have seen, the sheriff's deed, under which it claims, cannot be made to cover the strip in dispute without reformation, and this cannot be decreed without opening up the matter to redemption. It knew from the records what defendant was claiming; but defendant's claim was under its foreclosure proceedings and the sheriff's deed executed pursuant thereto. That deed cannot in this action be made to cover any property not described in the mortgage, and that property is lots 1, 2, and 3. The easements and appurtenances to these lots, of course, followed the title, and these are all that passed by· the sheriff's deed of the lots. *John Hancock Co. v. Patterson, supra,* is very much like this case, and the reasoning therein is peculiarly applicable here.

We are not called upon to determine who owns the part of the buildings or walls upon the seven-foot strip. The issues are not such as to involve that question, save incidentally. It must be conceded that defendant is not entitled to have the title to the seven-foot strip decreed to be in it; but, on the other hand, it cannot be held liable for rents because of the use of that part of the building which stands thereon. Plaintiff ·bank is entitled to have a lien

established upon the strip of land in dispute, subject to defendant's easement therein, which includes the right to use the building and walls and such part of the premises as is necessary for their comfortable enjoyment, without being liable for rent. This is as far as we are called upon to go under the issues. Should questions arise in the future as to duty to repair, rebuild, etc., these will be settled in proper proceedings.

The case is a most peculiar one, but, after due consideration, we are constrained to hold that the trial court was in error in its decree, and that the action should be remanded for one in harmony with this opinion.— *Reversed and remanded.*