WILL CHESHIRE, Appellant, v. McCOY & HENRY et al., Appellees.

MARCH 6, 1928.

*J. O. Watson*, for appellant.

*O. C. Brown* and *W. M. Wilson*, for appellees.

KINDIG, J.—Will Cheshire, plaintiff and appellant, owned the southwest quarter and the south half of the northwest quarter of Fractional Section 7, Township 75 north, Range 33 west  of the 5th P. M., in Warren County; while McCoy & Henry, defendants and appellees, held acreage to the east thereof, as follows: The southeast quarter and the south half of the northeast quarter of said section. These farms, as is readily seen, were immediately adjacent. The fence in dispute ran north and south, and formed the dividing line between the two properties.

Before and until May, 1900, Wesley Cheshire, father of appellant, owned both pieces, and in that month he conveyed to his son, Will, the portion now held by him. About the same time, he deeded the other real estate (now held by appellees) to a granddaughter, Susie Blake. Then, by repeated transfers, the chain of title continued in regular order until March 5, 1918, when appellees acquired the plot above indicated. This land was very hilly, uncultivated pasturage on both sides of the

division. In the year 1894, or thereabouts, appellant's father, Wesley Cheshire, constructed the fence where it remained until the 28th day of May, 1926, at which time the change now in controversy was attempted. No doubt the old ''division fence'' was established by acquiescence, for it had been recognized as and considered such for more than 10 years by the owners of the respective fees. *Uker v. Thieman*, 132 Iowa 79; *Fredricksen v. Bierent*, 154 Iowa 34. But it did not coincide with the government survey.

Up to that place, there is no disagreement between the litigants, but future events constitute the issue for the legal quarrel. Precisely, the specific point of difference at this juncture is, Did the respective owners agree upon a relocation for the ''fence?'' Decision must be based upon the following facts:

Soon after possession of the east half was obtained in 1918 by appellees, discussion arose concerning the location of the ''fence.'' Appellant more than once explained that his father, Wesley Cheshire, had refrained from locating it on a straight line, to avoid certain ditches or washouts. There had been talk between appellees and appellant regarding this, and finally there was presented the proposition of erecting a new ''fence.'' That was the latter part of April, 1926. During the trial, Ray McCoy was asked, and answered, these questions:

''Q. What did Mr. Cheshire say about it if a new fence was put in? A. Well, he agreed to put it in on the line. Q. All he had said was that he thought, when the new fence was put in, it ought to be straightened, didn't he? A. Put it where it belonged. * * * ''

Consequently, the three men went out on the premises for the purpose of running the true ''line,'' cut some willows for markers, and proceeded with the task. They soon found, however, they were a considerable distance over on Cheshire's land, and concluded that, to accomplish the project, it was necessary to hire a civil engineer. To this all agreed, and Mr. A. H. Gilliland was employed for the work. At the appointed time, he, together with appellees and appellant, went on the ground to make the survey. Three days were occupied in accomplishing this. Government corners were located, and the original ''government line'' fixed thereby. All through this performance, the appellant, Cheshire, took an active part; in fact, he carried the

chain for the surveyor, and helped place lath stakes as indicators. He saw the engineer commence several feet farther over on the Cheshire land than the point of the old corner post, but no objection was made thereto. And all the way across, the new "line" was on Cheshire's property, in which he acquiesced, by carrying the chain and helping to accomplish the new location. Finally, when the project was completed, the witness Fred Henry said to appellee:

"I told Mr. Cheshire—I think it was Monday—that I was going out to put in the new fence, and he asked me what it was going to cost. I told him, as near as I could. I didn't know what the labor would be, and he said, 'I am going to put mine in,' he said, 'before fall; it is too hot to work at it now.' "

Ed Taylor, who built appellees' portion of the "new fence,' said on the witness stand:

"Shortly after the survey, Mr. Cheshire said to me he thought the survey was all right. He was satisfied with the survey.".

As appellant was informed beforehand, appellees built a "new fence" on their half May 27th, 28th, and 29th, placing it on the "line" of the "new location" according to the original government survey, which had been "relocated" with appellant's assistance, as aforesaid. Ray McCoy further testified:

"This fencing, whatever was done, was at the request of Mr. Cheshire, for the repairing and fixing of the fence, so that he could turn his cattle in there. We put in a fence on this new line which was surveyed through. Q. What kind of a fence have you put in? A. Well, it is a steel fence, steel posts, 39-inch wire, with two barbed wires on top. A good one. Q. What is the cost of such a fence as that? A. Well, it cost about —I judge $1.25 to $1.40 a rod,—something like that. * * * About $1.50, I expect, per rod."

Afterwards, about the 12th of June, the appellant said to C. R. McCoy:

"I have found out I don't have to do that, and I am not going to do it."

Conforming with this suggestion, appellant started this suit on the same day, June 12, 1926.

Appellant founds his argument upon the basis that the only agreement entered into was to straighten the "line" be-

tween the two corners of the "old fence," thereby denying that there was any authorization or consent on his part to change the "corners" thereof. Chiefly, his reliance is placed upon *Uker v. Thieman*, supra. Referring now to that citation, we find this language:

"In the absence of other controlling circumstances, such recognition, acquiescence, and occupancy for a period of ten years fixes the true boundary. *Miller v. Mills County*, 111 Iowa 654. The appellants claim, however, that in 1900 an oral agreement was entered into by all parties which provided for the establishment of the correct government line between them, and that the line so established must be recognized now as the true line. That a survey was made in 1900, and a new line found by the surveyor, is undisputed, but there is a serious conflict in the testimony as to the purpose of the survey. The appellees contend that the agreement therefor permitted only the running of a straight line between points already established and recognized, while the appellants contend that it was an agreement to have a survey made to ascertain and establish a true line. The line marked by the fence had been established for more than fifteen years, as we have seen, before it was questioned by the defendants, and something more than an oral agreement was necessary to change it."

Two fundamental differences between the case at bar and *Uker v. Thieman*, supra, are readily apparent: First, the present controversy is removed from the statute of frauds, because the new "fence" was built and possession of the additional ground taken; and second, here there was an agreement to abide by the new survey. Further consideration of these propositions is appropriate, and attention will be given them in the order named.

Concession is made that the new "fence" was constructed on the "new survey," and that the entire territory up to it is being occupied by appellees. It is observed that Section 1841 of the 1924 Code provides:

" * * * any agreement in writing between adjoining landowners, when recorded in the office of the recorder of deeds, as in this chapter provided, shall bind the makers, their heirs, and subsequent grantees * * * ."

Nevertheless, such understanding may be oral, if there ex-

ist other prerequisites sufficient to remove the bar of the statute of frauds. *Kitchen v. Chantland*, 130 Iowa 618, aptly states:

"The most that can be said of the matter is that there was doubt and uncertainty, and perhaps a dispute, as to the true line after plaintiff acquired title to her property. Settlement was proposed by having a surveyor run the line. This was done, and the one claimed by plaintiff was fixed by the surveyor as the true one. With the knowledge and consent of defendant, plaintiff took possession of the strip in dispute, used, occupied, and improved it after the survey was made, and defendant did nothing, until about the time this suit was commenced, to indicate that he was not satisfied with the survey. * * * We have held that there may be a voluntary parol partition of lands. * * * Even if the case be within the statute of frauds, possession was taken under the agreement, and this removes the bar. * * *"

See, also, *Stevenson v. Robuck*, 179 Iowa 461.

Returning again to *Uker v. Thieman*, supra, we find that the "fence" there was placed without the knowledge of the antagonistic party; while in the present controversy it was put in with the "acquiescence" of appellant, and his implied consent after information concerning the contemplated construction. Furthermore, the *Uker* case recognizes the rule "that a line may be fixed by parol when its establishment is followed by possession or improvement with reference thereto."

Again, the case before us is different than that involved in *Fredricksen v. Bierent*, 154 Iowa 34, from which this quotation is taken:

"It is true that a new survey was had, which established the line where defendant now claims it to be, and that defendant purchased material with which to build a new fence, which fence was needed or demanded, no matter where the line; and that, over plaintiff's protests, defendant took possession of the strip of land in dispute, and erected a fence upon the line now claimed by him. * * * The trial court was justified in finding that, while the parties agreed to a new survey, plaintiff's version of the agreement is correct; and that he never, at any time, agreed to the erection of a fence upon the line of such survey, or to be bound by the results thereof, in so far as it affected the line as shown by an old fence and the boundary as theretofore

recognized by the parties and their grantors. * * * The new survey would not, of itself, establish the line. An express agreement to that effect would be necessary.''

Underlying facts in the *Fredricksen* case are distinguishable from those in the matter before us, because: First, there was a consent, implied at least, on Cheshire's part that McCoy & Henry could build a ''fence'' on the line of the ''new survey;'' and second, by implication, if not by direct contract, appellant here consented to be bound by the result of the ''new survey.'' Also, the *Fredricksen* case admits the rule that a parol contract is good if proper facts exist concerning possession and improvement thereunder. For instance, it is declared:

''But such an agreement [oral agreement], even if shown, unless followed by possession or improvement of the property with reference to the new line, with the acquiescence or agreement of the plaintiff, would not affect the old line as established by acquiescence and adverse possession.''

Because of all the facts and circumstances related in the historical events, including the disputes and discussions about the ''fence'' as originally located, together with the attempt at personal survey, the failure therein, and the final employment of a civil engineer, coupled with appellant's statement that the true ''line'' was to be found and the ''new fence'' built thereon, his assistance, and the part played by him in making the ''new survey,'' and finally the information imparted to him that appellees would construct a substantial ''new fence'' on the ''new line,'' appellant's inquiry concerning the cost of the same, his statement that he would ''build'' in the fall, because the weather at that time was too warm, and his assertions that the ''new survey'' was all right, and he was satisfied with it, knowing the new location and its appropriating a strip of his land, and all other matters involved, it appears, beyond a peradventure of a doubt, that appellant agreed to the ''new line'' on the original government survey. Although this was orally done, yet, in view of the fact that, at appellant's request, appellees bore their part of the burden in this undertaking, and expended their money for the material and labor for a new and substantial ''fence,'' and then took possession of the territory fixed and extended by the new boundary, all requirements of the statute of frauds have been met, and the contract is enforcible. True,

the appellant denies that he made such "contract," or that he knew appellees were going to furnish and place the "new fence;" yet the testimony of the other witnesses, together with the facts and circumstances, overcomes these negative assertions. Our understanding is that appellant does not deny appellees told him they were about to build the "fence," but he says they did not tell him where. Assuming that he is correct, how could he help but know their intention in this regard? Forsooth, he had spent three days with them and the engineer, establishing the very location. McCoy & Henry had refused to put it on the old "line," and appellant must and did know where the contemplated structure was to be.

Principally, it is well to note at this place that appellant's argument concerning his thought in reference to the survey's being between the two corners of the old location must equally fall, for the very good reason that he assisted with and helped locate the new "corners," without objections, but with apparent acquiescence and approval.

We do not overlook appellant's legal theory that estoppel, which is the basis of appellees' defense, must be clearly and satisfactorily proven. Previously this court has so held. *Bank v. Alcorn,* 188 Iowa 592; *Baldwin v. Lowe,* 22 Iowa 367. Such legal requirement has been  fully met, as shown by the former discussion. Recitation thereof at this place is unnecessary.

Essential to estoppel in the instant case is resulting prejudice to appellees because they relied upon appellant's consent to the relocation. *Browning v. Kannow,* 202 Iowa 465; *Euclid Ave. State Bank v. Nesbit,* 201 Iowa 506. Yet that prerequisite was complied with, for appellees made the improvement depending upon appellant's good faith in consenting to the new boundary.

The judgment and decree of the district court should be, and hereby is, affirmed.—*Affirmed.*

STEVENS, C. J., and EVANS, FAVILLE, and WAGNER, JJ., concur.