# IN THE SUPREME COURT OF IOWA

No. 22–0848

Submitted March 21, 2024—Filed June 14, 2024

**SUNDANCE LAND COMPANY, LLC,**

Appellant,

vs.

**PHILLIP REMMARK** and **BOBBIE REMMARK,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Wapello County, Wyatt Peterson, Judge.

A landowner seeks further review of a court of appeals decision affirming the district court's determination of a boundary by acquiescence. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman and McDermott, JJ., joined. McDonald, J., filed a special concurrence, in which May, J., joined. Oxley, J., filed a dissenting opinion.

Bradley M. Grothe (argued) of Craver & Grothe, LLP, Centerville, for appellant.

Bryan Goldsmith (argued) and Michael O. Carpenter (until withdrawal) of Gaumer, Emanuel, Carpenter & Goldsmith, P.C., Ottumwa, for appellees.

**MANSFIELD, Justice.**

### I. Introduction.

The saying goes that "good fences make good neighbors." Sometimes they make good boundaries as well. Under Iowa law, when neighbors have treated a fence or other marker as the dividing line between their respective properties for ten consecutive years, even if the legal line of demarcation is located elsewhere, either of them can go to court and seek a judicial decree that a boundary by acquiescence has been established.

But what if the properties are acquired by the same owner before anyone has gone to court? Does that mean the process of recognizing some boundary other than the legal one has to start over if the properties later go back into separate ownership? After all, when there is only one owner of the two properties, there is no need to recognize a boundary. No one is their own neighbor.

We join other jurisdictions in holding that a boundary by acquiescence determination contemplates that the properties have been in separate ownership during the required ten-year period leading up to the present controversy. This rule is consistent with the text of Iowa Code chapter 650 and leads generally to reasonable and fair outcomes. We disagree with the reasoning of the lower courts that would allow a party to seize on any past ten-year period of de facto boundary recognition by two neighbors, regardless of intervening events, and have that boundary declared the actual legal boundary.

### II. Background Facts and Proceedings.

**A. The Properties at Issue.** This case concerns two parcels in Wapello County located north–south of each other. The north parcel (North Property) is approximately 80 acres. The south (South Property) is approximately 60 acres. Access to both properties is from Lake Road, which lies to the east and runs north–south.

The county used to have an easement for a road that ran west from Lake Road. The road's east–west path ran slightly north of the legal boundary between the two properties. At some point, a fence was put up along the north edge of the right of way for the road. Evidence remained of the old road with rows of trees on either side. The record does not reveal when the road ceased to exist, but the county abandoned the easement for it in 1980. As will be discussed, the fence continued until recently.

**B. The Handlings' Ownership of the North Property.** The North Property was owned for many years by Larry and Linda Handling, and after their 2001 divorce, by Linda Handling alone.

Handling always considered the fence line to be the "proper boundary" between the tracts. Handling never mowed the land to the south of the fence. She testified that she never had a survey of the land done and was not aware of a survey being performed while, or before, she owned the North Property. She never removed the purported boundary fence.

In the mid-1990s, Scott Hubbell began leasing the North Property. He was a continuous tenant of the North Property until Linda sold the land to him in May 2014. At this point, Handling still considered the southern boundary of the parcel to be the fence line.

**C. The Sims' Ownership of the South Property.** For many years, Hobart and Mary Sims owned the South Property. A neighbor recalled that Hobart Sims always regarded the fence line as the boundary. He recalled that Sims always maintained the area south of the fence and that the Handlings never did.

**D. The Hubbells' Possession and Then Ownership of the North and South Properties.** Scott Hubbell, a farmer, began renting the North Property from the Handlings to farm in the mid-1990s. About a year after that, Hubbell began renting the South Property from the Sims to farm. Other than the fact that

the Sims continued to live in the home on the South Property, Hubbell had essentially full control over both tracts of land. Hubbell raised row crops.

In 2004, Hubbell put in a large machine shed south of the fence line on what he assumed was the South Property. In 2005, he and his wife entered into a contract for deed to purchase the South Property from the Sims. The Hubbells moved into the house located on the South Property, and the Sims moved out.

Scott Hubbell recalled that the fence was "dilapidated" when he began renting the two properties. He removed it at some point, but Hubbell put in a new fence when he decided to pasture cattle on the North Property during the winter. In 2010, he removed the new fence. However, some fence posts remain, and thus the fence line is discernible even today.

In May 2014, Hubbell and his wife completed the contract for deed and became record title owners of the South Property. At the same time, the Hubbells purchased the North Property, thus making them record title owners of both properties.

In 2014 or 2015, Scott Hubbell installed a grain bin south of the old fence line. Again, this was on what he believed was the South Property. However, Hubbell was not concerned with the boundary between the two parcels while he rented both of them and especially while he owned both of them.[1] The Hubbells' ownership of the two properties continued for almost three years.

---

[1]Hubbell testified as follows:

Q. When you owned both properties for roughly three years, did you have a boundary line inside your property dividing the property from yourself?

A. No.

Q. Be no reason to have a boundary line for property that you owned on both sides, right? Is that correct?

A. Correct.

**E. The Remmarks' Purchase of the South Property.** In April 2017, the Hubbells sold the South Property to Phillip and Bobbie Remmark. Hubbell did not believe he was giving the Remmarks "anything less than the total use of the machine shed . . . [o]r the grain bin." The realtor's brochure indicated that the shed and the grain bin were included in the sale.

**F. Sundance's Purchase of the North Property.** Sundance Land Company purchased the North Property from the Hubbells in September 2018. Keith Davis, the president and manager of Sundance Land Company, testified regarding the acquisition and events that followed. Before the purchase, Davis went to the property to view it and had a few questions about entrances and access. He also looked up the property on the county GIS website and noticed that the property line showed "encroachment of some of the southern property." He decided to have a land survey done.

The August 2018 survey revealed that the legal boundary between the North Property and the South Property actually ran south of the fence line. As a result, the machine shed was encroaching onto the North Property by "18.73 feet to 20.07 feet" and the grain bin pad "at its maximum by 21.16 feet." The surveyor recorded his survey on August 24.

Despite this information, Sundance went through with the purchase. Davis felt that the encroachment was "something that c[ould] be worked out" between the two property owners.[2]

---

[2]Specifically, Davis testified as follows:

Q. And then you still decided to go forward?

A. Yes.

Q. And why?

A. Well, typically, when there's an encroachment like that between two property owners, it's something that can be worked out amongst each other to eliminate an issue. It's done all the time, and it was in my feelings and thoughts

**G. The Parties' Litigation.** The parties were not able to resolve their dispute. On June 4, 2020, Sundance filed a petition against the Remmarks in the Wapello County Iowa District Court. The petition asked the court to quiet title according to the survey boundary lines, alleged that the Remmarks were trespassing on the North Property, and requested a temporary injunction against the Remmarks' entry on the North Property.

On July 27, the Remmarks filed an answer urging the court to dismiss the case. Additionally, they filed a counterclaim asserting that a new boundary between the properties had been established by acquiescence.

The parties proceeded to a bench trial beginning on August 4, 2021, and agreed the case would be tried in equity. The district court concluded that a boundary line by acquiescence had been established at the old fence line. The court specifically found that a boundary had been established during the Handlings' and Sims' respective ownership of the North and South Properties. Both owners had recognized the fence line as the boundary for more than the required ten years. The court also rejected Sundance's argument that the Hubbells' common ownership of both parcels from 2014 to 2017 erased the boundary by acquiescence. It noted that even during the period of common ownership, Scott Hubbell had assumed that the machine shed and the grain bin were on the South Property. It also noted that Sundance had been aware of facts to put it on notice of a boundary issue before buying the South Property. Further, the district court took the position that Iowa law did not allow common ownership to eradicate a boundary by acquiescence once it had been recognized by the parties.

---

at that point that everything could be taken care of without any issues and that we could go from there.

Sundance appealed. It argued that the facts did not establish acquiescence in the fence line as a boundary and that even if they did, the common ownership of both parcels by the Hubbells terminated any past boundary by acquiescence and required the ten-year clock to restart. The court of appeals affirmed. We granted Sundance's application for further review.

**III. Standard of Review.**

The parties previously agreed these claims would be tried in equity. They now agree that our standard of review is de novo. *See Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 811 (Iowa 2000) (en banc). Exercising de novo review, "[w]e have the responsibility to examine the facts as well as the law and to decide anew the issues properly presented." *Id.* But, we still give "great weight" to the trial court's findings "because the trial court is in a far better position to weigh the credibility of witnesses than the appellate court." *Albert v. Conger*, 886 N.W.2d 877, 880 (Iowa Ct. App. 2016) (quoting *Davis-Eisenhart Mktg. Co. v. Baysden*, 539 N.W.2d 140, 142 (Iowa 1995)).

**IV. Legal Analysis.**

**A. The Doctrine of Boundary by Acquiescence.** Iowa Code chapter 650 codifies the doctrine of boundary by acquiescence in our state. It allows a boundary other than the legally described boundary to become the official boundary between two parcels of land. It requires that the proposed boundary has been "recognized and acquiesced in by the parties or their grantors for a period of ten consecutive years." Iowa Code § 650.6 (2020).

"[A] boundary-by-acquiescence claim arises from the conduct and consent of two adjoining property owners." *Vaudt v. Wells Fargo Bank, N.A.*, 4 N.W.3d 45, 52 (Iowa 2024).

> [I]t is the law in Iowa that where two adjoining property owners mutually acquiesce for ten or more consecutive years in a line

> definitely marked by a fence or in some other manner, it then becomes the true boundary although a survey may show otherwise, and neither party intended to claim more than called for by their respective deeds.

*Dart v. Thompson*, 154 N.W.2d 82, 84 (Iowa 1967). "Both parties must be aware that the asserted property line is being treated as a boundary." *Ollinger v. Bennett*, 562 N.W.2d 167, 170 (Iowa 1997). "Determining whether acquiescence has been established requires an inquiry into the factual circumstances of each case." *Id.* at 171. "It is also well settled the burden is upon the party claiming a boundary line, other than as disclosed by a surveyor, to establish requisite [m]utual acquiescence by clear proof." *Davis v. Hansen*, 224 N.W.2d 4, 6 (Iowa 1974).

We agree that the record prior to 2014 would have supported a boundary by acquiescence along the fence line if the owner of either property had gone to court at that point. It appears that both the Handlings and the Sims treated the fence as the boundary between their properties for many years. The Handlings maintained the area north of the fence line; the Sims maintained the area south of it. After the fence was removed, it was still possible to trace a potential boundary using the fenceposts. *See Sille v. Shaffer*, 297 N.W.2d 379, 381 (Iowa 1980) (stating that a boundary by acquiescence must be "definitely marked by fence or in some manner"); *Vaudt*, 4 N.W.3d at 48 (discussing a landscape barrier "marked by trees, bushes, and mulch" as a claimed boundary by acquiescence).

Scott Hubbell's erection of the machine shed in 2004 also supports this conclusion. He assumed that he was putting up the shed on the South Property, the one he entered into a contract to buy a year later. It would be somewhat odd to have a building straddling two different properties, one of which he was only renting. We therefore conclude that if this action had been brought before the

Hubbells took title to both properties in May 2014, the district court's finding of a boundary by acquiescence would have been correct.

**B. The Significance of the 2014–17 Common Ownership of Both Parcels.** Sundance contends, though, that because both tracts of land came under unitary ownership in May 2014, and remained so until April 2017, any prior de facto acceptance of a boundary other than the legal one must be disregarded. According to Sundance, the ten-year clock for calculating boundary by acquiescence restarted when the properties once again were separately owned.

Chapter 650 is part of a subtitle of the Iowa Code relating to special actions. It allows a form of special action to be brought to resolve disputed corners and boundaries. Sections 650.1 through 650.5 describe procedures for bringing such an action. Section 650.6 is more substantive and provides,

> Either the plaintiff or defendant may, by proper plea, put in issue the fact that certain alleged boundaries or corners are the true ones, or that such have been recognized and acquiesced in by the parties or their grantors for a period of ten consecutive years, which issue may be tried before commission is appointed, in the discretion of the court.

Iowa Code § 650.6.

Sections 650.7 through 650.13 deal with additional procedural matters. And then section 650.14, which is also substantive, provides,

> If it is found that the boundaries and corners alleged to have been recognized and acquiesced in for ten years have been so recognized and acquiesced in, such recognized boundaries and corners shall be permanently established.

*Id.* § 650.14. These two sections are "declaratory of the law" even when a case is not brought under the chapter 650 special action procedures. *Kennedy v. Oleson*, 100 N.W.2d 894, 899 (Iowa 1960).

Although the issue is one of first impression in Iowa, the general law elsewhere appears to be that when two adjoining parcels come under common ownership, any potential boundary by acquiescence between them is eradicated, and the clock starts anew upon a subsequent separate conveyance. According to the leading treatise in this area:

> After the creation of a boundary by acquiescence, the two neighboring parcels may come under common ownership due to subsequent transfers. At this point in time, the boundary by acquiescence no longer has legal significance as it no longer performs the function of marking a boundary between neighbors. Any monument that marked the boundary by acquiescence, such as a fence, is now wholly within the unified tract.

James Charles Smith & Donald J. Kochan, Law of Neighbors § 6:10, Westlaw (database updated May 2023).

Smith and Kochan approve of the result reached by the Colorado Supreme Court in *Salazar v. Terry*, 911 P.2d 1086 (Colo. 1996) (en banc). The case involved a statute essentially identical to Iowa Code section 650.14 except for the time period: "[I]f it is found that the boundaries and corners alleged to have been recognized and acquiesced in for twenty years have been so recognized and acquiesced in, such recognized boundaries and corners shall be permanently established." *Id.* at 1088 (quoting Colo. Rev. Stat. § 38-44-109 (1982)).

The case arose after the plaintiff commissioned a survey and discovered that the survey lines between her land and her neighbor's land were actually 100 to 160 feet west of a substantial fence that had been present since 1888. *Id.* at 1087. The defendant claimed "the fence line was acquiesced in and recognized by the parties or their predecessors in title for twenty years under the terms of" the Colorado statute. *Id.* at 1088. However, it turned out that in 1977, the same entity had owned both parcels for fifteen days. *Id.* After a bench trial, the district court found that there had nonetheless been a boundary by acquiescence. *Id.*

The intermediate appellate court reversed, holding "that the period of common ownership effectively abrogated the acquiescence chargeable to the parties concerning the fence as the actual boundary [because when] 'ownership was joined, the fence no longer served as an external boundary, but only as an internal barrier.' " *Id.* at 1089 (quoting *Terry v. Salazar*, 892 P.2d 391, 393 (Colo. App. 1994)).

The Supreme Court of Colorado affirmed. *Id.* at 1092. As it put it, "In practical effect, once the common ownership destroyed the prior acquiescence of the fence as boundary, the twenty-year clock, for purposes of the acquiescence statute, started ticking anew." *Id.* at 1089. In reaching this decision, the court found persuasive "the doctrine of merger as it applies to extinguishment of easements." *Id.* at 1090. In its view, the easement and boundary by acquiescence situations were analogous because common ownership eliminates the practical need for the easement, just as it eliminates the practical need for delineation of boundaries. *Id.* at 1090–92. Under the doctrine of merger of easements, the required time period has to restart when the parcels are again owned separately. *See id.* at 1091.[3]

The Colorado court also was "guided by cases arising in other jurisdictions," specifically Illinois and Missouri. *Id.* at 1090. In *Conklin v. Newman*, two landowners owned adjoining parcels with hedge fences between them. 115 N.E. 849, 849–50 (Ill. 1917). After the fences had been in place for more than twenty years, one of the landowners acquired the other tract. *Id.*

---

[3]There was a dissent in *Salazar*. *See* 911 P.2d at 1092 (Kourlis, J., dissenting). The dissent took the position that the doctrine of boundary by acquiescence works like a statute of repose. *Id.* at 1093–94. According to the dissent, once neighbors have acquiesced in a boundary for the requisite time period, that boundary is permanently established regardless of whether there has been a court proceeding recognizing it as such. *Id.* We explain later on why we believe that view is unsound.

Thereafter, the landowner conveyed each of the two tracts to a different family member, the conveyance to take effect upon his death. *Id.* at 850.

A dispute arose when one of the new owners cut down a hedge fence and replaced it with a wire fence. *Id.* In resolving the case, the Illinois Supreme Court found that any division of the properties based on the hedge fence had no effect. *Id.* When the previous owner

> became the owner of the whole . . . tract, the two portions of this fence ceased to be appurtenant to any particular parts of the tract, and any agreement and division that had theretofore been made while the ownership of the two [tracts] w[ere] in different persons ceased to exist or to be effective.

*Id.*

In *Patton v. Smith*, abutting landowners hired a surveyor and built a fence based on where they were told the boundary lines were. 71 S.W. 187, 188 (Mo. 1902). Each party utilized the property up to their respective sides of the fence, "believing that it was the true dividing line." *Id.* One of the owners then purchased the other tract and became a common owner of both plots until they were purchased separately by two new owners. *Id.* These owners eventually learned that the prior surveyor's boundary line was not correct, and one of them brought suit. *Id.* at 189.

The Missouri Supreme Court rejected the adverse possession defense that was raised by the owner relying on the prior survey and fence line: "If there had ever been such an agreed line, it was eliminated when [he] became the owner of both tracts." *Id.* at 190. Thus, the timeline for an adverse possession claim began running at the point the tracts once again became separately owned. *See id.*; *see also Foltz v. Brakhage*, 36 N.W.2d 768, 771 (Neb. 1949) ("When the owner of two contiguous tracts of land conveys one of the tracts to a grantee, and subsequently conveys the other tract to a different grantee, in a contest between

the grantees concerning the boundary line between the two tracts, the subsequent grantee cannot for the purpose of establishing title by adverse possession against the first grantee tack his possession to that of the common grantor.").

Although their decisions were not referenced in *Salazar*, Utah courts have also taken the same approach. *See, e.g., Orton v. Carter*, 970 P.2d 1254, 1258 (Utah 1998) ("It is true that common ownership of adjoining properties, even for a brief season, restarts the clock for determining boundary by acquiescence."); *Jacobs v. Hafen*, 917 P.2d 1078, 1078–79 (Utah 1996) (discussing the amount of time necessary to make a boundary by acquiescence claim and initiating the time frame "once separate ownership was established"); *Briem v. Smith*, 112 P.2d 145, 146 (Utah 1941) (discussing a common owner of two tracts of land who sold one and retained the other and stating that "[a]ny boundary line between the two properties, other than the line described in that deed, had its origin, if at all, at or after that time").

In addition, our own court has found that common ownership extinguishes easements. As we have said, "[E]asements are extinguished when the dominant and servient estates merge . . . ." *Gray v. Osborn*, 739 N.W.2d 855, 862 (Iowa 2007); *see also Feilhaber v. Swiler*, 212 N.W. 417, 418 (Iowa 1927) ("[O]n the reconveyance of the dominant estate to [the current] owner of the servient estate, there was a merger by reason of the unity of title . . . , with consequent unity of possession and enjoyment, and an extinguishment of the easement."); *La Plant v. Schuman*, 196 N.W. 280, 282 (Iowa 1923) ("[A]n easement by implication does not arise under such circumstances until there is a severance of the land by the owner of the whole. It is axiomatic that no one can have an easement in his own property. . . . [I]t is only upon a severance by sale, or otherwise, that an easement is created corresponding to the arrangement made prior to and visibly existing

at the time of the severance."); *Carrigg v. Mechs.' Savs. Bank of Providence, R.I.*, 111 N.W. 329, 332 (Iowa 1907) ("No easement exists so long as there is a unity of ownership, because the owner of the whole may at any time rearrange the qualities of the several parts . . . ."). The underlying principles governing easements and boundaries by acquiescence seem similar, as noted by the Colorado Supreme Court in *Salazar*. Just as the need for the easement generally goes away under common ownership, so too does the need for the boundary. Hence, it is logical to require reestablishment of the easement or the boundary when separate ownership resumes.

We are aware of no out-of-state authority that is contrary to *Salazar*. The *Salazar* approach seems to make sense. What if adjoining properties had been under common ownership for 100 years and were then sold separately? Could one argue that the true boundary is not the one set forth in the legal descriptions but a fence that some separate owners had recognized as a boundary over a century ago?

The crux of the matter, though, is whether Iowa statutes and caselaw *allow* us to follow this approach, even if we might believe it is a better rule and more consistent with the general common law of boundary by acquiescence. Again, Iowa Code section 650.14 provides,

> If it is found that the boundaries and corners alleged to have been recognized and acquiesced in for ten years have been so recognized and acquiesced in, such recognized boundaries and corners shall be permanently established.

We note that the *Salazar* court was dealing with essentially the same statute. Reading section 650.14 in isolation, it might be possible to interpret it as providing that *any time* two owners have recognized and acquiesced in a boundary for *any* consecutive ten-year period, a boundary is thereby permanently established—regardless of intervening events before anyone goes to

court. In other words, the statute is self-executing, and a party just needs to find any ten-year period of a recognized and acquiesced boundary somewhere in the past.

That seems absurd. Could one neighbor sue another neighbor today claiming part of that neighbor's land based on a fence that was put up and treated as a boundary for a ten-year period in the 1860s but was taken down in the 1870s and never recognized as a boundary again?

In any event, we read statutes as a whole. Iowa Code section 650.6 requires a plea that the boundaries "have been recognized and acquiesced in by the parties or their grantors for a period of ten consecutive years." Iowa Code section 650.14 requires a finding that the boundaries "have been recognized and acquiesced in for ten years." The phrase "have been" in reference to a time period implies a continuous time leading up to the present or near-present—typically up until the current controversy arose. The legislature chose the words "have been"—not "were." We wouldn't say today that Iowa's *prior* Governor "has been in office for a period of X consecutive years." But we would say that Iowa's *current* Governor "has been in office for a period of Y consecutive years."

Also, the phrase "the parties or their grantors" seemingly requires mutual recognition and acquiescence over a consecutive ten-year period by *two* individuals or entities—either the parties or their predecessors in interest. If the parties themselves didn't recognize the boundary for ten consecutive years and the parties had the *same* predecessor in interest, those circumstances would seemingly fall outside the statute. It's true that in statutory interpretation, the plural can include the singular, but not when the activity is mutual recognition and acquiescence. It takes two to tango. We think the phrasing requires separate grantors in the chain of title from whenever the ten-year period starts through the present. One would not be able to say that "the grantors" of the Remmarks

and Sundance recognized and acquiesced in the boundary for ten consecutive years when they have each owned the property for only a few years and had the same grantor. So, we read section 650.6 as supporting the *Salazar* rule.[4]

The Remmarks counter that in *Ollinger v. Bennett*, 562 N.W.2d at 171–72, we decided that once the facts would give rise to a boundary by acquiescence, subsequent events cannot change things. *Ollinger* involved two adjacent parcels of land. *Id.* at 168–69. An existing fence and a line of trees were clearly recognized as the boundary by both owners from 1972 until 1988. *Id.* at 169. A dispute arose in 1993 when the successors to one of the owners commissioned a survey and determined that fence did not give them the full land area that they were entitled to under the legal description. *Id.* at 169–70. In the ensuing litigation, an argument was raised that any boundary by acquiescence had been repudiated in 1988 when the parties now claiming acquiescence had commissioned their own survey and entered into agreement with their own children stating that the legal boundaries would control. *Id.* at 169–71.

We rejected that argument, stating, "We do not believe that the actions taken by the Ollingers after the ten-year period required for acquiescence negate or repudiate such acquiescence in this case." *Id.* at 171. We added, "[W]e believe scrutinizing parties' conduct, after acquiescence has been established, for signs of repudiation would undermine the purpose of establishing boundaries by acquiescence." *Id.* We concluded, "We believe that the goals underlying the doctrine of acquiescence are best served in this case by giving effect to the conduct of the owners of both parcels between 1972 and 1993." *Id.* at 172.

---

[4]We note also that in *Salazar* the period of common ownership was a quirk that lasted only fifteen days. 911 P.2d at 1088. Here, by contrast, Hubbell owned both the North and the South Properties for almost three years. Prior to that time, he removed the fence, and, according to his testimony, he put back in some posts only to prevent people from parking on his bean field.

Also, some time ago, in *O'Callaghan v. Whisenand*, we said,

It would be intolerable if, after permanent buildings have been erected according to a line which both parties claimed to be their common boundary, one of them could, by procuring a new survey, and establishing some inaccuracy in the survey in accordance with which the recognized boundary was established, require the other to remove his permanent buildings in order to give the first some small portion of land to which he finds himself entitled in accordance with such new survey.

93 N.W. 579, 579 (Iowa 1903).

We do not read these authorities as broadly as the Remmarks, the district court, and the court of appeals do. The present case does not involve an effort by a party to *unilaterally* repudiate what the law would recognize as a current boundary by acquiescence.[5] It involves the question whether subsequent events—specifically common ownership—can ever defeat what would otherwise be a prior boundary by acquiescence. We think so. Just as parties can jointly acquiescence in a boundary, they can jointly engage in conduct—such as transferring their properties to a common owner—that unwinds that acquiescence. Again, the alternative view would allow a landowner invoking chapter 650 to reach back and grab *any* ten-year consecutive period of an acquiesced boundary, even if that boundary had long disappeared, the parties had stopped treating it as a boundary in the distant past, or the property had been under common ownership and the boundary had ceased to be relevant. This would be highly disruptive of parties' expectations. A buyer of real estate

---

[5]*Tewes v. Pine Lane Farms, Inc.*, a case mentioned by the dissent, also involved an attempted unilateral repudiation. *See* 522 N.W.2d 801, 803 (Iowa 1994). In *Tewes*, the plaintiff requested a survey when he acquired a parcel of land. *Id.* The survey was performed in February 1991, and the plaintiff took possession of the property in March 1991. *Id.* When the defendant wouldn't accept the survey line as the boundary line, the plaintiff filed suit in April 1991. *Id.* at 804. We agreed with the trial court that a boundary by acquiescence had been continuously recognized by the prior owners from 1975 to 1991 and that it was "too late" in 1991 for the plaintiff to try to eliminate it unilaterally through his survey. *Id.* at 808.

would not be able to rely on a legal description even when there were no conditions on the ground suggesting the description did not reflect the recognized boundaries. Also, there would be less of an incentive to get possible boundaries by acquiescence settled by decree so they became part of the record chain of title of the properties. Title searches would become more of a game of chance.

We also emphasize that the "doctrine of practical location" is not before us. *See Kendall v. Lowther,* 356 N.W.2d 181, 188–89 (Iowa 1984). This is a rule of estoppel that prevents a party that purchases property while knowing and accepting a clearly marked boundary from later contesting that boundary. *See Schauland v. Schmaltz,* 107 N.W.2d 68, 71 (Iowa 1961). We applied that doctrine in *Schauland v. Schmaltz* under the following circumstances:

> The rule governing the situation here is thus stated in 11 C.J.S. *Boundaries* § 77, p. 651: 'A practical location made by the common grantor of the division line between the tracts granted is binding on the grantees who take with reference to that boundary. The line established in that manner is presumably the line mentioned in the deed, and no lapse of time is necessary to establish such location, which does not rest on acquiescence in an erroneous boundary, but on the fact that the true location was made, and the conveyance in reference to it.' Here we have conveyances of the respective lots made by common grantors, with the division line apparently clearly marked. Not only was the line apparent, but there is evidence from a competent witness that at the time of the sale to Mayme E. Otto, Dora Mohnssen, one of the grantors, said to her that the hedge fence and the northerly side of the garage was the northerly boundary of Lot 6, the property Mrs. Otto was purchasing.

*Id.*[6] The doctrine of practical location does not require ten years of continuous recognition of the boundary by adjoining landowners. *See Kendall,* 356 N.W.2d at 188. But for the doctrine to apply,

---

[6]In *Schauland,* we affirmed the district court's ruling based on the doctrine of practical location, although we indicated there was "support in the record" for boundary by acquiescence. 107 N.W.2d at 70. Notably, common ownership of the properties had ended in August 1948. *Id.* at 70–71.

the grantors and grantees involved must all be aware of a boundary which is clearly marked on the land and which is evident or pointed out to them at the time of the conveyance. The marked boundary will then control if the parties accept that marked boundary by their words or actions which amount to express approval of the marked boundary.

*Id.*

The doctrine of practical location has not been raised in this case. *See Cozad v. Strack*, 119 N.W.2d 266, 270 (Iowa 1963) ("It is doubtful that plaintiffs' amended petition here is broad enough to state a claim under the doctrine applied in *Schauland v. Schmaltz*. We therefore give such doctrine no further consideration here."); *Schauland*, 107 N.W.2d at 71 ("While practical location was not in express terms pleaded or argued by the plaintiffs, they did plead and argue estoppel, which is sufficient to bring the rule of estoppel by practical location before us, if the facts in the record show it."). In response to Sundance's quiet-title action, the Remmarks pleaded and pursued only a counterclaim of boundary by acquiescence under chapter 650.[7]

---

[7]Finally, a few words on the dissent and the special concurrence. The dissent takes the position that the statute is self-executing, although the parties can then repudiate that which is self-executing. This approach is inconsistent with the text of the statute. *See* Iowa Code § 650.14 ("*If it is found* that the boundaries and corners alleged to have been recognized and acquiesced in for ten years have been so recognized and acquiesced in, such recognized boundaries and corners shall be permanently established." (emphasis added)). The dissent's elastic approach is also antithetical to property law, where clear rules are needed, and the statutes generally provide them.

The dissent also seems to say that when a common owner acquires properties that were formerly under separate ownership, the common owner needs to eliminate any trace of an existing physical marker—e.g., fence, trees, or whatever. Otherwise, whenever separate ownership resumes, there will be a boundary by acquiescence if there could have been such a boundary before, even if it was *long* before. In addition to lacking support in the statutory text and the caselaw, the dissent's approach also disregards the availability of more suitable equitable doctrines, especially the doctrine of practical location, to remedy harsh outcomes. Neither estoppel nor the doctrine of practical location has been raised here. The Remmarks brought only a counterclaim under chapter 650. It isn't clear that the elements of the doctrine of practical location could be met here. One element is that both grantees (i.e., both the Remmarks and Sundance) have purchased with knowledge and acceptance of the marked boundary. *See Schauland*, 107 N.W.2d at 71. Also, the record indicates that the Remmarks had released the Hubbells prior to the trial of this case.

In sum, we join other jurisdictions in holding that common ownership eradicates potentially acquiesced boundaries between the two properties other than the legally established ones.

**V. Conclusion.**

For the foregoing reasons, we vacate the decision of the court of appeals, reverse the district court judgment, and remand for entry of judgment for Sundance in accordance with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Christensen, C.J., and Waterman and McDermott, JJ., join this opinion. McDonald, J., files a special concurrence, in which May, J., joins. Oxley, J., files a dissenting opinion.

---

The special concurrence, meanwhile, does not offer a coherent explanation for how this case should be decided. Initially, the special concurrence concludes that the statute *is* self-executing. In doing so, it too disregards the actual text of the statute. *See* Iowa Code § 650.14. But then the special concurrence says that the boundary by acquiescence becomes "largely irrelevant" when the adjoining parcels are acquired by a common owner. In other words, the statute *isn't* self-executing after all because common ownership resets the situation. Additionally, the special concurrence discusses the doctrine of practical location and related forms of estoppel, agreeing with us that those principles aren't raised here.

**McDonald, Justice (concurring specially).**

The court begins its analysis of this case with a survey of out-of-state cases and "the general common law of boundary by acquiescence" and then asks whether Iowa law "allows" this court to follow what the court perceives to be the better rule. I disagree with this approach to determining and applying Iowa law. The first step in a case involving the interpretation and application of Iowa law should be to determine what Iowa law is and not which result the court would like to reach and then determine whether Iowa law disallows it. That being said, on this record, I also conclude the district court erred in resolving this quiet-title action. I thus concur in the court's judgment.

Under Iowa law, a boundary established by acquiescence is self-executing. *See, e.g.*, *Tewes v. Pine Lane Farms, Inc.*, 522 N.W.2d 801, 808 (Iowa 1994) (holding that the boundary was established prior to litigation at the expiration of the required ten-year period for acquiescence); *Mullahey v. Serra*, 264 N.W. 63, 64 (Iowa 1935) (holding that the boundary was already established before the defendant purchased one of the adjoining parcels and prior to litigation). Under Iowa law, a boundary established by acquiescence transfers title. *See, e.g.*, *Ollinger v. Bennett*, 562 N.W.2d 167, 172 (Iowa 1997) (explaining that the doctrine of boundary by acquiescence serves to "settle titles"); *Kulas v. McHugh*, 86 N.W. 288, 289 (Iowa 1901) (holding that "plaintiffs' title to the strip in question had vested" on account of a recognized and acquiesced in boundary). *But see Vaudt v. Wells Fargo Bank, N.A.*, 4 N.W.3d 45, 51 (Iowa 2024) ("Rather, the doctrine is 'boundary by acquiescence,' and it merely establishes the boundary between two adjoining parcels; it does not disturb title to property as the *Heer* [*v. Thola*, 613 N.W.2d 658, 661 (Iowa 2000),] court suggested."). A boundary established by acquiescence becomes largely irrelevant once the adjoining

parcels come into common ownership. *See* James Charles Smith & Donald J. Kochan, *Law of Neighbors* § 6:10, Westlaw (database updated May 2023) (explaining that after the adjoining parcels come under common ownership, "the boundary by acquiescence no longer has legal significance as it no longer performs the function of marking a boundary between neighbors"); *see also Salazar v. Terry*, 911 P.2d 1086, 1090 (Colo. 1996) (en banc) (collecting sources). The common owner is free to change the established boundary between the commonly owned properties as he sees fit.

Thus, where, as here, a common grantor conveys adjoining properties, the relevant inquiry is not whether there had been a boundary previously established by acquiescence but instead what boundary the common grantor set when conveying the properties. This inquiry involves determinations of what the grantor sold, what representations he made to the grantees, and whether the grantees had notice of any discrepancy between the represented or apparent boundary and the legal description of the properties conveyed. These determinations implicate, among other things, contract law, the common grantor rule, the law of estoppel, and the law of easement by implication rather than the law of boundary by acquiescence. *See, e.g.*, *Schauland v. Schmaltz*, 107 N.W.2d 68, 71 (Iowa 1961) ("The grantors, and those in privity with them and claiming under them, after selling in accordance with a boundary line clearly evident on the land or pointed out by them, or both as in the instant case, cannot afterward be heard to say that the line is different and the marked boundary incorrect. The principle of estoppel applies."); *Parizek v. Klein*, 68 N.W.2d 299, 302 (Iowa 1955) ("Where contending innocent parties derive title of adjoining tracts from a common grantor by successive mesne conveyances, and it develops there is a shortage, the one claiming under the common grantor's first deed is not required to contribute to the [shortage]."); *Gripp v. Four Appointments of the United*

23

*Brethren Church in Christ*, 161 N.W. 668, 669 (Iowa 1917) ("But here the defendants were in possession of the land they purchased, and their grantor, before selling the land to the plaintiff, expressly informed plaintiff of defendants' purchase of the land they were then occupying, and that this tract was what they were to receive. . . . That there was a deed containing a misdescription is of no consequence, because plaintiff was expressly told that defendants were in possession of the lands which they purchased."); *Teachout v. Duffus*, 119 N.W. 983, 983 (Iowa 1909) ("That the driveway in question was an apparent and visible easement belonging to the property conveyed to the plaintiff's grantor does not admit of doubt, and, if it is reasonably necessary for the use of his property, he is entitled to its continuance."); *see also Northrop v. Opperman*, 784 N.W.2d 736, 739 (Wis. Ct. App. 2010) ("This exception permits a boundary to be established by acquiescence in less time than the statutory period if the parties received their parcels from a common grantor. In that situation, a line established by the grantor—a fence, for example—is dispositive of the boundary."); 11 C.J.S. *Boundaries* § 147, Westlaw (database updated May 2024) ("A boundary may be established by acquiescence in less time than a statutory period otherwise prescribed if the parties received their parcels from a common grantor, and in that situation, a line established by the grantor, e.g., a fence, is dispositive of the boundary."); *Law of Neighbors* § 6:10, Westlaw (database updated May 2023) (explaining that when a common owner sells part of the unified tract, "the law's aim should be to enforce the parties' agreement in fact" regarding the location of the boundary).

I agree with the court that none of the most relevant issues have been raised by the parties. Bound by the party presentation rule, *see Jorgensen v. Smith*, 2 N.W.3d 868, 875 (Iowa 2024) (discussing the party presentation rule); *Sager v. Farm Bureau Mut. Ins.*, 680 N.W.2d 8, 14 (Iowa 2004) (noting that under

our "adversarial" system, "we generally consider only questions argued by the parties"; as a result, our opinions "should not be understood as all-encompassing court-approved treatises on a given body of law" (emphasis omitted)), *superseded by statute on other grounds*, 2005 Iowa Acts ch. 70, §§ 19–21 (codified at Iowa Code § 515.109 (2007)), I concur in the judgment.

May, J., joins this opinion.

**OXLEY, Justice (dissenting).**

The majority does not dispute that a boundary by acquiescence had long been established in the old fence line—at least until Hubbell became the common owner of both properties in 2014. But once the adjoining properties came into common ownership, according to the majority, poof—that established boundary disappeared as a matter of law. When Hubbell later conveyed the properties to different parties, at different times, and even though the previously acquiesced boundary was still intact without any changes by Hubbell, the ten-year clock had to start over. Respectfully, this doesn't make sense. Even more concerning, the majority's conclusion requires it to interpret Iowa Code sections 650.6 and 650.14 contrary to how we have construed those provisions for over a hundred years.

The majority's conclusion is inconsistent with the fact that boundaries by acquiescence are self-executing. *See Vaudt v. Wells Fargo Bank, N.A.*, 4 N.W.3d 45, 51 (Iowa 2024); *see also Ollinger v. Bennett*, 562 N.W.2d 167, 170 (Iowa 1997) ("When the acquiescence persists for ten years the line becomes the true boundary . . . ." (quoting *Sille v. Shaffer*, 297 N.W.2d 379, 381 (Iowa 1980))). Our cases establish that the acquiesced boundary continues unless and until adjoining parties take action to repudiate the established boundary. *See Ollinger*, 562 N.W.2d at 171 (rejecting claim that "actions taken by the Ollingers after the ten-year period required for acquiescence negate[d] or repudiate[d] such acquiescence in this case"); *see also Cheshire v. McCoy & Henry*, 218 N.W. 329, 331 (Iowa 1928) (holding that actions by both property owners established a different boundary); *Uker v. Thieman*, 107 N.W. 167, 167–68 (Iowa 1906) (rejecting argument that boundary recognized for fifteen years was repudiated when the parties hired a surveyor to locate the correct government line where

parties disputed the purpose for survey). Under our longstanding jurisprudence, a common owner *could* change the boundary by his unilateral actions since he owns both parcels. But it does not follow that common ownership *necessarily eviscerates, as a matter of law*, a boundary that was established by acquiescence before he owned both properties.

The majority turns this framework on its head. No longer is acquiescence established after the requisite ten-year period. Now, there must be continued joint acquiescence until the present dispute arises, regardless of how long it had existed in the past. So, the majority reasons, when adjacent properties come into common ownership, the required continuing acquiescence cannot be established since the owner cannot acquiesce with himself, and any prior period of acquiescence is eviscerated. This is inconsistent with our cases treating acquiescence as self-executing. Instead of requiring the party challenging the boundary to show it has been repudiated, the party claiming a boundary by acquiescence must prove all property owners since the time of the initial ten-year period continued to acquiesce with their neighbor. The majority claims this is unique to situations where adjoining properties come into common ownership. But its reasoning relies on its newfound interpretation of Iowa Code section 650.6 and section 650.14, so it applies to all boundary by acquiescence disputes.

If the boundary is self-executing, the question in this case is not whether Hubbell, as the common owner, can acquiesce with himself. The proper question is whether he did anything to repudiate the boundary that the Handlings and the Sims had previously acquiesced in. Considering the specific facts here—including that Hubbell constructed a machine shed and a grain bin over the true line while he leased both properties, left what remained of the old fence line intact while he owned both properties, and represented the fence line as the boundary when he sold the first of the two properties to the Remmarks—Hubbell

did nothing to change the acquiesced boundary. So, it should have remained. Instead, the Remmarks are left with a machine shed that is only partly on their property, and Sundance receives a windfall.

The majority follows the lead of *Salazar v. Terry*, 911 P.2d 1086 (Colo. 1996) (en banc), which is the only other case that has actually decided this issue. I agree we should consider decisions of other courts. But we should not blindly follow them when applying Iowa law, particularly in areas like property law where our jurisprudence is often unique. Not only does our boundary by acquiescence jurisprudence differ from that recognized in *Salazar*, but the Colorado Supreme Court went off track by applying rules from distinct principles of property law involving *use* of property, not *ownership* of property, leading to the illogical result that over one hundred years of acquiescence in a fence line as a boundary was eviscerated by fifteen days of happenstance. *See id.* at 1092 ("The acquiescence to the fence as the boundary separating the two tracts of land was wiped out when common ownership of both tracts was held for a period of fifteen days."). This led that court to conclude (which the majority here adopted) that a property line loses all *legal* effect when adjoining properties come into common ownership. It might lose practical effect, but I disagree that it ceases to have legal significance absent any other action by the common owner. The plat records are not changed. Property taxes continue to be separately assessed for each parcel.[8] True—the common owner *could* decide to sell a different portion of his adjacent properties. But that would require having the properties resurveyed to establish the new boundary line. The point is that the legal effect of the property line between adjacent properties does not disappear

---

[8]If the common owner failed to pay property taxes on one parcel but not the other, I don't think the county could sell both parcels at a tax sale. The majority's reasoning suggests otherwise.

when the properties come into common ownership, even if the practical effect might. And that fact is true whether that property line is set by the legal description in the deed or the prior property owners' acquiescence in a different line.

In following *Salazar*, the majority *sub silentio* changed centuries of Iowa law, a result I cannot join. I therefore respectfully dissent.

**I. Under Iowa Law, a Boundary by Acquiescence is Self-Executing and Requires Affirmative Action by Adjoining Property Owners to Repudiate.**

Unmoored from *Salazar*, I would follow the natural progression of our own cases. In *Ollinger v. Bennett*, we said: "Acquiescence exists when both parties acknowledge and treat the line as the boundary. When the acquiescence persists for ten years *the line becomes the true boundary* even though a survey may show otherwise and even though neither party intended to claim more than called for by his deed." 562 N.W.2d at 170 (emphasis added) (quoting *Sille*, 297 N.W.2d at 381). This has been the law in Iowa for over a century. *See Uker*, 107 N.W. at 167 ("In the absence of other controlling circumstances, such recognition, acquiescence and occupancy for a period of 10 years *fixes the true boundary*." (emphasis added) (citing *Miller v. Mills County*, 82 N.W. 1038 (Iowa 1900))). And it has persisted to the present as recognized in cases like *Ollinger*.

Subsequent action—by the initial acquiescing parties or by others down the line—does not change that established boundary unless the parties take affirmative action to do so. In *Uker v. Thieman*, the fact that the parties hired a surveyor to locate the correct government line did not defeat the boundary recognized for the prior fifteen years where the parties disputed the reason for obtaining the survey. *See* 107 N.W. at 167–68 ("[T]he evidence does not clearly

show an agreement to establish a boundary different from that fixed by the old fence."). Similarly, in *Tewes v. Pine Lane Farms, Inc.*, we held:

> Although Tewes took action such as putting steel posts on the survey line and planting his crop to the survey line once he took possession of the property, his actions were too late. The required ten-year period for acquiescence under Iowa Code section 650.14 had run by the year 1991 when Tewes became the owner of the northern tract.

522 N.W.2d 801, 808 (Iowa 1994). Tewes was bound by his predecessor's acquiescence. Under these cases, and contrary to the majority's position, the fact that the Handlings and the Sims—separately and at different times—transferred their property to the same person, i.e., a common owner, does not invalidate their previously acquiesced boundary.

This is true even after the original acquiescing parties no longer own the property. In *Ollinger*, Coburn acquiesced in a boundary for over ten years with the Ollingers that cut .35 acres off his property and then sold his property to the Griffins in 1988. *See* 562 N.W.2d at 170. Also in 1988, the Ollingers obtained a survey, subdivided their property to leave a parcel to each of their two children, and executed a fence agreement identifying "the actual legal descriptions of the respective properties [as] represent[ing] the true and correct boundary lines between said [subdivided] properties." *Id.* at 169. Five years later, the Griffins learned of the boundary discrepancy when they obtained a survey in their effort to sell the property to the Bennetts. *Id.* Aware of the dispute, the Bennetts went through with the purchase and then lost in a quiet-title lawsuit with the Ollingers. *Id.* at 170. We concluded that a boundary by acquiescence had been established by the Ollingers and Coburn for the requisite ten-year period by at least 1988—so before Coburn sold to the Griffins. *Id.* at 171 ("[B]ecause both the Ollingers *and Coburn* treated, for well over ten years, the fence and tree line as

the western and northern boundaries of the property then owned by Coburn, those boundaries were established by acquiescence." (emphasis added)). We rejected the Bennetts' argument that "actions taken by the Ollingers after the ten-year period required for acquiescence negate[d] or repudiate[d] such acquiescence in this case." *Id.* Critically, the Griffins' acquiescence was immaterial to our analysis even though they were intervening owners between Coburn, who acquiesced with the Ollingers, and the Bennetts, who raised a dispute with the Ollingers five years later, after they purchased the property from the Griffins. The boundary was set before the Griffins ever owned the property, so their continued acquiescence was not needed to maintain the boundary. *See id.*

These cases teach two things. First, a boundary by acquiescence is self-executing; that is, once the ten-year period is satisfied, the boundary is established, and subsequent actions—including conveyances to other parties—don't defeat the established boundary. This understanding formed part of the reason we overruled *Heer v. Thola*, 613 N.W.2d 658, 661 (Iowa 2000) (en banc), earlier this year. *See Vaudt*, 4 N.W.3d at 51 (explaining that the *Heer* majority's reasoning was flawed where it was "based on its [mis]understanding that establishing a boundary by acquiescence is not self-executing, such that 'judicial intervention is a requirement for establishing title by acquiescence'" (quoting *Heer*, 613 N.W.2d at 661)). The majority now disavows that characteristic of our boundary by acquiescence law, concluding instead that acquiescence must continue to the present. If that is correct, then we should not have overruled *Heer* in *Vaudt v. Wells Fargo Bank, N.A.,* 4 N.W.3d 45.[9]

---

[9]A note about our recent *Vaudt*, 4 N.W.3d 45, opinion. We misstated the law of boundary by acquiescence in the opinion when we criticized the *Heer* majority for referring to boundary by acquiescence as "title by acquiescence," relying on *Cuthbertson v. Locke*, 30 N.W. 13, 14 (Iowa 1886). *Id.* at 51 ("Rather, the doctrine is 'boundary by acquiescence,' and it merely establishes

Of course, parties can choose to establish a different boundary even after a boundary by acquiescence has been established—if they do something affirmatively to change it. *See, e.g.*, *Cheshire*, 218 N.W. at 331 (finding that when appellant assisted in subsequent survey and agreed to move fence and appellee constructed fence and used disputed property based on the newly surveyed line, "the contract is enforceable" despite the parties having previously acquiesced in a different boundary line). But that doesn't mean common ownership eviscerates a previously established boundary by acquiescence as a matter of law. Which brings up the second point from our caselaw: Boundary by acquiescence depends on the specific facts of each case. *See Ollinger*, 562 N.W.2d at 171 ("Determining whether acquiescence has been established requires an inquiry into the factual circumstances of each case."). So, the majority's extreme hypotheticals about reaching back one hundred years to find any ten-year period of acquiescence by long-gone predecessors in a boundary that no longer exists

---

the boundary between two adjoining parcels; it does not disturb title to property as the *Heer* court suggested." (citing *Cuthbertson*, 30 N.W. at 14)). *Cuthbertson* was decided under chapter 8 of the Acts of the 15th General Assembly, titled "An Act to Provide for the Permanent Survey of Lands." 30 N.W. at 13. That statutory scheme did not provide for establishing a boundary by acquiescence outside of the survey process. *See* 1874 Iowa Acts ch. 8, §§ 1–4 (codified at Iowa Code ch. 8, §§ 1–4 (1880)). In 1897, the general assembly rewrote that statutory scheme and enacted it as sections 4228 through 4239 in chapter 5 of Title XXI of the 1897 Iowa Code, titled "Of Actions to Establish Disputed Corners and Boundaries." Iowa Code, preface to second edition (1897). The 1897 provisions are the predecessors to the current version of chapter 650 of the Iowa Code. Under these provisions, and contrary to what we said in *Vaudt*, establishing a boundary by acquiescence does affect title and ownership. *See, e.g.*, *Sille*, 297 N.W.2d at 381 (holding that plaintiff established a boundary by acquiescence and remanding "for entry of a judgment quieting title to the disputed tract in the plaintiff").

This misstatement notwithstanding, our *Vaudt* opinion turned on the second flaw we found in *Heer*, where that opinion had concluded that boundary by acquiescence was not self-executing but instead required judicial intervention to identify when a claim for boundary by acquiescence arose. *See Vaudt*, 4 N.W.3d at 51 (discussing that the causal connection required by Iowa Code § 614.14 turned on when the claim arose). The majority now says that a boundary by acquiescence is *not* self-executing. This is the critical feature of the acquiescence doctrine elucidated in this case. And it reveals that the majority is now *sub silentio* overruling the very cases it relied on to overrule *Heer* just months ago.

add little to the analysis. Instead, we should apply our long-held understanding that a boundary is established on showing ten years of acquiescence by adjoining property owners. We can then consider the specific facts to determine whether subsequent events—including common ownership—did anything to negate or repudiate that boundary. *See Cheshire*, 218 N.W. at 331.

As the majority concedes, the old fence line was established as the boundary by acquiescence before 2014. Just as in *Ollinger*, 562 N.W.2d at 170–71, where the Griffins' acquiescence was immaterial after the ten-year period was satisfied by their predecessors, the same should follow here: Hubbell's acquiescence was not needed *to continue* recognizing the boundary where his predecessors had already satisfied the ten-year period. The fact that he could not acquiesce with himself is simply irrelevant. The correct question for us to resolve is whether Hubbell did anything during his ownership of both properties to negate or repudiate that boundary. On that relevant question, the record is clear: Hubbell did nothing to change the previously acquiesced boundary. He did not remove what remained of the fence. Nor did he convey the property using a different legal description.[10] Moreover, he affirmatively represented to Remmark that the old fence line was the boundary when he sold the south property. The

---

[10]Had the legal description changed from that used when Hubbell separately acquired each property, then the observation by the commentators relied on by the majority and the concurrence may have some relevance. *See* James Charles Smith & Donald J. Kochan, *Law of Neighbors* § 6:10, Westlaw (database updated May 2023) ("In a real estate transaction when an owner is selling only part of her land, both seller and buyer should realize the significance of how they draw and describe the boundary that will separate the seller's retained land from the buyer's grant. . . . *Since the parties knew they were crafting a new boundary by subdividing part of the seller's larger tract,* their language should generally not be interpreted in light of previous owners who dealt with different legal parcels." (emphasis added)). But where, as here, Hubbell acquired adjoining parcels after the boundary had been established and the legal description did not change, there was no drawing and describing done by the buyer (the Remmarks) and the seller (Hubbell). Rather, Hubbell used the same legal description to sell the south property to the Remmarks as when he acquired it from the Sims.

real estate agent confirmed this representation by expressly informing the Remmarks that the machine shed was on their property.

Given the facts of this case, I agree with the district court and the court of appeals that the old fence line was established as the boundary by acquiescence prior to Hubbell coming into common ownership of the properties, and he did nothing to negate or repudiate that boundary. I would therefore affirm based on application of longstanding Iowa property law.

**II. By Following *Salazar*, the Majority Has Changed Boundary by Acquiescence in Iowa.**

In its effort to fall in line with *Salazar*, the majority now requires that the acquiescence be continuous through the time the lawsuit is filed before a boundary is established. This is contrary to our established law. And it is not supported by the majority's efforts to merely interpret chapter 650.

The majority reads the phrase "have been recognized and acquiesced in by the parties or their grantors" in Iowa Code § 650.6 (2020) to require "separate grantors in the chain of title from whenever the ten-year period starts *through the present*" (emphasis added), or, as it otherwise describes, "a continuous time [of acquiescence] leading up to the present or near-present." Section 650.6 has remained unchanged for well over a century, so nothing has changed about the statute. *Compare* Iowa Code 650.6 (2024), *with* Iowa Code § 4230 (1897); *see also Kotze v. Sullivan*, 231 N.W. 339, 340 (Iowa 1930) ("Commencing with *Miller v. Mills County*, [82 N.W. 1038], this court has continuously held that where a line marking the boundary between adjoining owners is recognized as such for a period of ten years and has been acquiesced therein for that period, *such line becomes the true boundary*, notwithstanding it is not the line fixed by government survey. The cases recognizing and applying this rule are too numerous in this state to require citation." (emphasis added)).

Yet the majority's new rule is necessarily inconsistent with that understanding as reflected in cases like *Ollinger* and *Tewes*, which, as explained above, establish that the boundary is determined when the ten-year period is satisfied—even if no one has brought a claim under chapter 650 to establish it. The North Dakota Supreme Court expressly distinguished our acquiescence statute from its own on this very basis—that Iowa Code section 650.14 "does not tie the statutory period to the commencement of the action." *James v. Griffin*, 626 N.W.2d 704, 708–09 & n.1 (N.D. 2001) (rejecting plaintiffs' reliance on *Ollinger* and *Tewes* based on the differences between the states' respective statutes). Notably, the court then distinguished these Iowa cases from *Salazar*, which it characterized as holding "that once prior acquiescence of a boundary has been destroyed, the statutory clock for obtaining title by acquiescence begins 'ticking anew.' " *Id.* at 709 (quoting *Salazar*, 911 P.2d at 1089). We, of course, determine the meaning of our statutes and precedents. But it is prescient that the North Dakota Supreme Court saw what the majority now claims is not there.

The majority attempts to distinguish our precedents as rejecting subsequent *unilateral* attempts to repudiate an otherwise existing boundary, whereas this case involves a different set of subsequent circumstances involving common ownership. What the majority does not say, however, is that its reading of the statute is not limited to the situation of an intervening common owner. If sections 650.6 and 650.14 require continuous acquiescence to the time of the present dispute as a matter of statutory construction, that requirement exists for all claims for boundary by acquiescence. This has never been the law in Iowa. *See Ollinger*, 562 N.W.2d at 170; *Tewes*, 522 N.W.2d at 808.

Indeed, *Ollinger* would come out differently if it were decided under the majority's new rule requiring acquiescence to the time of the present dispute. That case involved intervening owners, the Griffins, who owned the adjoining

property between the time it was owned by Coburn, who acquiesced with the Ollingers to establish the boundary, and the time it was owned by the Bennetts, who raised a dispute with the Ollingers after purchasing the property from the Griffins. *See Ollinger*, 562 N.W.2d at 169–70. We held that the boundary was established by Coburn's more-than-ten-years' acquiescence with the Ollingers at least by 1988. *Id.* at 171 (rejecting, as lacking support in prior Iowa caselaw, Bennetts' argument that subsequent events defeated the boundary by acquiescence that was established at least by 1988). The Griffins' continued acquiescence didn't matter.

Under the majority's new rule—requiring acquiescence to the time of the present dispute—Coburn's original acquiescence would not have bound the Bennetts without evidence that the Griffins, the intervening owners, continued to acquiesce in the boundary for the five years they owned the property. *Cf. Griffin v. Brown*, 149 N.W. 833, 838 (Iowa 1914) ("There must, however, be something in the record to show that the party, charged with acquiescence, consented to the act of the other in establishing the line and assuming possession."). But we did not require such evidence; instead, we concluded that the acquiescence was completed in 1988, before the Griffins purchased the property from Coburn. *Ollinger*, 562 N.W.2d at 171. We then considered what it takes to repudiate an acquiesced boundary. *Id.* at 170–71. On that point, we noted that repudiation is disfavored because "scrutinizing parties' conduct, after acquiescence has been established, for signs of repudiation would undermine the purpose of establishing boundaries by acquiescence." *Id.* at 171. In setting up its attempted distinction of *Ollinger*, the majority asks "whether subsequent events—specifically common ownership—can *ever* defeat what would otherwise be a prior boundary by acquiescence." (Emphasis added.) That is a bait and switch from what we said in *Ollinger*. Common ownership *can* defeat a prior

acquiesced boundary *if* the common owner does something to negate or repudiate the established boundary, *Ollinger,* 562 N.W.2d at 171,—but it doesn't *necessarily* do so.

The majority also contrives policy concerns not raised by the parties to support its position. But its concerns all rely on there being only two options: either common ownership *always* eviscerates a prior acquiesced boundary, or it *never* does. Interpreting sections 650.6 and 650.14 the way we always have—that the boundary is self-executing after ten years but can be repudiated by adjoining property owners—raises none of the majority's purported concerns. Nor is it our place to rewrite centuries of property law doctrine based on a modernized view of a statute that has existed virtually from the beginning of time—or at least the beginning of our statehood. Whether current technology or practices should change how we treat boundary disputes is a matter for the general assembly to address, not us.

### III. *Salazar v. Terry* Conflated Distinct Principles of Property Law.

The majority followed the lead of the 4–3 majority opinion in *Salazar v. Terry,* 911 P.2d 1086. But the Colorado Supreme Court lost its way when it plucked language out of cases involving distinct principles of property law such as maintenance of division fences, easements, and barrier fences. Settled principles of property law are important to our rural state, and we must be careful not to confuse distinct principles. These other principles of property law address *use* of property, where common ownership of adjoining property has legal (as well as practical) significance, rather than *ownership* of property. But it does not follow that common ownership of adjoining properties should have the same legal significance when a boundary—which *does* affect ownership—has been established by acquiescence.

The *Salazar* court said it was "guided by cases arising in other jurisdictions," *id.* at 1090, but none of those cases decided the issue at hand. The *Salazar* court relied primarily on an Illinois case, *Conklin v. Newman*, 115 N.E. 849, 851 (Ill. 1917), which is where that supreme court first went astray. 911 P.2d at 1090.

**A. First—*Conklin.*** *Conklin* didn't even involve a boundary dispute. It involved a different fencing issue: Which part of a division fence each property is responsible for maintaining (or was "appurtenant to," as described in *Conklin*). *See Conklin*, 115 N.E. at 851 (discussing section 3 of the Fence Act).[11] In *Conklin*, Benjamin Newman acquired adjoining 40-acre parcels at different times and deeded one to his daughter (Conklin) and one to his son (Newman), both effective at his death. *See id.* at 850. After he died, the siblings both claimed the south half of the division fence as theirs to maintain. *Id.* The brother cut down 500 hedge trees that made up the south half of the fence line, replacing them with a three-wire fence. *Id.* at 849. The sister sued in trespass for removing the

---

[11]Illinois, like Iowa and other midwestern states, has a "Fence Act" that requires adjoining property owners to share the cost of maintaining a fence between their properties. *See In re Est. of Wallis*, 659 N.E.2d 423, 428 (Ill. App. Ct. 1995) (holding that the requirement in Illinois's Fence Act (which had then been in place for 120 years) for adjoining landowners to maintain a "just proportion of the division fence between them" did not necessarily require each to maintain one-half the linear distance of the fence, discussing 765 Illinois Compiled Statutes Act 130, sections 3 and 7 (1992) (emphasis omitted)); *see also Duncalf v. Ritscher Farms, Inc.*, 627 N.W.2d 906, 909 (Iowa 2001) (en banc) (reaffirming that Iowa Code section 359A.1A (Supp. 1997) requires "fence viewers to apportion the shared costs of partition fences so as to equalize the burden" between adjoining property owners even if only one of them has livestock). Parties often use the "Right Hand Rule," under which "each owner maintains the length of the fence to the owner's right side as though both landowners were standing on their property facing each other over the partition fence." David S. Steward, Note, *Iowa Agricultural fence Law: Good Fences Make Good Neighbors*, 43 Drake L. Rev. 709, 713 (1995). "The law does not require any particular division, and the adjacent landowners may agree to apportion the fence in any manner they desire." *Id.* Statutory rules governing the maintenance of division fences are contained in Iowa Code chapter 359A, appropriately titled "Fences," an entirely different part of the Iowa Code than chapter 650, addressing "Disputed Corners and Boundaries," at issue here.

windbreak provided by the hedges and leaving inadequate fencing for her tenant's hogs. *Id.*

It was in this context that the Illinois Supreme Court made the statement quoted in part by *Salazar*:

> It is undisputed that during the time Benjamin Newman owned the west 40 and Rice owned the east 40, Benjamin Newman owned and maintained the south half of this fence as appurtenant to the west 40. When he acquired title also to the east 40, and thus became the owner of the whole 80-acre tract, the two portions of this fence ceased to be appurtenant to any particular parts of the tract, and *any agreement and division that had theretofore been made while the ownership of the two 40's was in different persons ceased to exist* or to be effective.

*Conklin,* 115 N.E. at 850 (emphasis added); *see Salazar,* 911 P.2d at 1090 (quoting *Conklin,* 115 N.E. at 850).[12] Which property was responsible for maintaining which portion of the division fence becomes irrelevant when both properties are owned by the same person—he is both legally and practically responsible for the entire fence. Any preexisting agreement about which half of the fence went with which property is what "ceased to exist or be effective" when adjoining properties come into common ownership.

*Conklin* involved maintenance of a division fence, a doctrine of property law distinct from establishment of a boundary line between properties. That distinction is clear under Iowa law. *See, e.g.,* David S. Steward, Note, *Iowa*

---

[12]*Salazar* also quoted 5 Richard R. Powell, *Powell on Real Property* § 62.02[10], at 62-19 (1994) [hereinafter *Powell*], where that treatise says: "A division fence often loses its utility and always loses its legal significance when separate ownership of the parcels is merged in one owner." *Salazar,* 911 P.2d at 1090. Chapter 62 of Powell's treatise covers "Fences," with section 62.02 focusing on division fences. *Powell* § 62.02, at 62-10. Subsection 62.02[10], quoted by *Salazar,* immediately follows subsection 62.02[9], explaining the duty to maintain division fences, and it cites *Conklin. Id.* § 62.02[9]–[10], at 62-17. The chapter includes a short discussion of how a fence can become a division fence by acquiescence in subsection 62.02[3]. *Id.* § 62.02[3], at 62-12 to 62-13. A review of that treatise reveals that *Salazar*'s reliance on subsection [10]—like its reliance on *Conklin*—was misplaced.

*Agricultural fence Law: Good Fences Make Good Neighbors*, 43 Drake L. Rev. 709, 718 n.107 (1995) ("Fence viewers do not have authority to decide on a disputed boundary line. They may only determine the [maintenance] obligations, rights, and duties of the parties involved." (citing *McAvoy v. Saunders*, 143 N.W. 548, 549 (Iowa 1913))). *Conklin* does not support *Salazar*'s position that a boundary line ceases to exist between adjoining properties that come into common ownership. And it certainly does not support the majority's decision to follow *Salazar*, particularly in light of Iowa property law recognizing distinct differences between setting boundaries and determining maintenance responsibilities.

**B. Next—Easements.** The majority here adopted *Salazar*'s analogy to easements, *see* 911 P.2d at 1090–91, to support its position that common ownership eviscerates any previously acquiesced boundary and requires restarting the ten-year clock. But easements are also a discrete area of property law with significant distinctions that prevent it from providing a useful analogy to boundaries. Like maintenance of a division fence, easements involve benefits and burdens on the *use* of property, but they do not affect the *ownership* of property in the way that setting a boundary line does.

"An easement is a liberty, privilege or advantage in land without profit, existing distinct from ownership." *Hawk v. Rice*, 325 N.W.2d 97, 98 (Iowa 1982). It "entitles the owner of the easement to *use or enjoy* land in the possession of another." *Bormann v. Bd. of Supervisors*, 584 N.W.2d 309, 316 (Iowa 1998) (en banc) (emphasis added) (quoting Restatement of Prop. § 451 cmt. *a*, at 2911–12 (Am. L. Inst. 1944)). The land receiving the benefit from the easement is the dominant estate, and the property burdened by the easement is the servient estate. *See id.* "[W]hile the dominant tenement owner has the right to use the servient tenement according to the terms of the easement, the fee owner retains whatever uses do not interfere with the rights of the dominant owner." *Skow v.*

*Goforth*, 618 N.W.2d 275, 278 (Iowa 2000) (en banc) (quoting 7 *Thompson on Real Property* § 60.04(b)(1), at 458 (David A. Thomas ed., 1994)). So, when the dominant and servient estates come into common ownership, the owner has all rights of use, and the dominant and servient estates are deemed to have merged as a matter of law. *See Tamm, Inc. v. Pildis*, 249 N.W.2d 823, 837 (Iowa 1976). This makes sense because an easement grants only the right to use another person's property while preventing the owner from interfering with that use, and one cannot interfere with his own use. *See Gray v. Osborn*, 739 N.W.2d 855, 862 (Iowa 2007) ("[A]s easements are extinguished when the dominant and servient estates merge, it would be both illogical and impossible to create an easement for the benefit of the same land which the easement burdens.").

"No easement exists so long as there is a unity of ownership, because the owner of the whole may, at any time, rearrange the qualities of the several parts." *Feilhaber v. Swiler*, 212 N.W. 417, 418 (Iowa 1927) (quoting *Marshall Ice Co. v. La Plant*, 111 N.W. 1016, 1019 (Iowa 1907)).

> But the moment a severance [of the dominant and servient estates] occurs, by the sale of a part, the right of the owner to redistribute the properties of the respective portions ceases, and *easements or servitudes are created, corresponding to the benefits and burdens mutually existing at the time of the sale.*

*Id.* (emphasis added) (quoting *Marshall Ice Co.*, 111 N.W. at 1019.)

Easements, like requirements to maintain a division fence, appear and disappear because of their purpose: allocating burdens and benefits with respect to use of property. But they have nothing to do with ownership of the adjoining properties.

**C. Finally—Barrier Fences.** In the decision affirmed by the 4–3 *Salazar* majority, the Colorado Court of Appeals seemed to think a fence could be a boundary fence or a barrier fence, but not both. *See Terry v. Salazar*, 892 P.2d

391, 393 (Colo. Ct. App. 1994). It set up the issue in the case as an "either/or" proposition when it began its discussion by explaining that "[i]t is a question of fact to be decided by the finder of fact as to whether a fence is acquiesced in as a boundary or merely exists to serve as a barrier." *Id.* Setting the question up this way led to its conclusion, quoted by the Colorado Supreme Court, that once "ownership was joined, the fence no longer served as an external boundary, but only as an internal barrier." *Salazar*, 911 P.2d at 1089 (quoting *Terry*, 892 P.2d at 393).

A barrier fence has significance in property law, particularly in rural areas like Iowa, where fences serve not only as boundaries between properties but also as barriers to keep one property owner's livestock in or another's out. *See, e.g., Brown v. McDaniel*, 156 N.W.2d 349, 352 (Iowa 1968) (describing a purpose "to fence in stock by the owners of Lot 9, or to fence out animals from a garden maintained thereon by the Whitney family" as establishing a barrier). Although treating a fence as a barrier will not satisfy the requirements for *establishing* a boundary by acquiescence, *see id.* (rejecting attempt to establish fence six feet off a property line as an acquiesced boundary line absent a "showing as to its use or purpose by those holding title thereto"), once a fence is established as a boundary, it does not necessarily lose that status just because it is later used as a barrier. In other words, nothing prevents a fence from being both—after it is first established as a boundary. The *Salazar* court veered even further off track when it treated the boundary/barrier distinction as mutually exclusive alternatives.

**IV. No Other Case Directly Supports the Majority's Opinion.**

The majority says it is merely following the lead of the "general law elsewhere[, which] appears to be that when two adjoining parcels come under common ownership, any potential boundary by acquiescence between them is

eradicated, and the clock starts anew upon a subsequent separate conveyance." "Appears" is the operative word. A closer look at the other cases cited by the majority reveals the illusory appearance. The cases routinely hold that a period of common ownership cannot be used to *establish* a period of acquiescence. But they say nothing about the effect of common ownership on a boundary previously established by an adequate period of acquiescence.

In *Patton v. Smith*, adjoining property owners hired a surveyor who put the line in the wrong place. 71 S.W. 187, 190 (Mo. 1902). The court explained that attempting to locate the true line is not the same thing as acquiescing in an agreed boundary, so the erroneous survey line "estops no man from claiming to the true line whenever it is afterwards ascertained." *Id.* In addressing whether the defendant had "a right to the possession . . . by virtue of an agreed line," the court concluded: "[T]here never was any agreed line by the plaintiff with any one else, nor by any person with whom the plaintiff stands in privity, nor in fact by any one." *Id.* Acquiescence simply was not in play.

After establishing this erroneous line, one of the original owners came into ownership of both properties and then conveyed the two properties to different parties, *id.* at 189, so the case at least involved common ownership issues. But the common ownership discussion related to tacking for purposes of adverse possession—whether one party who lacks the requisite time to establish adverse possession can tack on his predecessor's period of adverse possession to reach the requisite ten years. *Id.* It was in this context that the *Patton* court said:

> [W]hen Remelius became the owner of both tracts of land, all such [tacking] questions became immaterial. There was no adverse holding thereafter by Remelius as the owner of one tract against himself as the owner of the other tract, and there was no longer any question of any agreed line dividing the two tracts.

*Id.* at 190.[13]

The majority also cites a Nebraska case, *Foltz v. Brakhage*, 36 N.W.2d 768, 771 (Neb. 1949), which (like *Patton*) said subsequent grantees from a common grantor cannot tack the common grantor's possession to his own for purposes of adverse possession. That makes sense, *id.* ("Butler could not hold adversely to himself, and during the time he was a common owner of the northwest quarter and the southwest quarter of Section 11 his possession of one was in nowise adverse to his ownership of the other."), and extension of that tacking rule to acquiescence logically follows. As applied here, the Remmarks could not use Hubbell's period of common ownership to *establish* the ten-year period of acquiescence since Hubbell could not acquiesce with himself.

But more important to the issue here, the *Foltz* court went on to discuss the history of the properties prior to coming into common ownership in 1942. *Id.* at 771–72 ("The record does not show that any owner of the northwest quarter *prior to Bernice C. Butler* [the common owner] at any time made any claim, adverse or otherwise, to any part of the southwest quarter until 1936 or 1937, at the time when Bernice C. Butler told Carl Ninneman that the fence line was not in the proper place and he would like to change it . . . ."). *Foltz* supports the noncontroversial position that common ownership cannot count toward the required period of acquiescing in a boundary. But *Foltz* contradicts the majority's

---

[13] *Salazar* also quoted from a Michigan law review article written by law professor Olin Browder: "Where, after a boundary agreement, title to the parcels affected become united, it has been held that a subsequent grantee of one of the parcels takes according to the terms of his deed unaffected by the agreement. (footnote omitted)." *Salazar*, 911 P.2d at 1090 (quoting Olin L. Browder, *The Practical Location of Boundaries*, 56 Mich. L. Rev. 487, 530 (1958)). The footnote omitted by *Salazar* cited to *Patton*, 71 S.W. 187. Professor Browder's statement—addressing the practical location doctrine—must be read in light of the case he cited and the doctrine he was applying. As noted by the majority, that doctrine differs from boundary by acquiescence.

expanded position that common ownership goes further and eviscerates any prior period of acquiescence in a boundary.

The majority next relies on cases from Utah. *Orton v. Carter* addressed what constitutes a sufficient boundary, specifically whether a lane could be a proper boundary after a fence line was partially removed in the 1930s to create a lane between two properties. *See* 970 P.2d 1254, 1255 (Utah 1998). A dispute over the boundary arose in 1992, and the Carters argued the fence had been removed in the 1930s, so the boundary had not been maintained for the requisite twenty-year period, starting in 1925 when the adjoining properties were last commonly owned. *Id.* at 1258. The Utah Supreme Court affirmed the district court's conclusion that the partial fence and "well-defined common lane" were sufficiently visible to mark the boundary. *Id.* at 1257. Although the court cited *Salazar* in addressing the Carters' argument about common ownership—stating, "It is true that common ownership of adjoining properties, even for a brief season, restarts the clock for determining boundary by acquiescence," *id.* at 1258 (citing *Salazar*, 911 P.2d at 1089)—it also concluded that common ownership of the lots prior to 1925 was immaterial because the twenty-year period was long established after the period of common ownership, so what happened prior didn't matter, *id.* At best, this statement about *Salazar* is dicta. At worst, the Utah court gave credence to *Salazar* in a case where it had no relevance.

The other Utah cases cited by the majority similarly do not support its holding. *Briem v. Smith* involved a fence between two city lots that was never deemed a boundary fence by anyone. *See* 112 P.2d 145, 146 (Utah 1941) ("Here we are not concerned with a boundary line that was uncertain for any reason other than that the fence, possibly inadvertently, was erected on a diagonal line. Up to the time this case was started, there is no indication that the exact location of the fence was considered material by either party or that it affected in any way

the enjoyment of either piece of property, either by way of enhancement or limitation."). The court's recognition that the period of acquiescence had to begin after the grantor was no longer the common owner reflects only that a common owner cannot acquiesce with himself. *Id.* (recognizing that "the question of acquiescence is one to be decided from the particular facts and circumstances of the case" and beginning its common ownership discussion by "[r]everting to the facts further"). *Jacobs v. Hafen* addressed whether a period of eighteen and a half years could satisfy the "unusual circumstances" exception to its twenty-year requirement for boundary by acquiescence, holding it could not. 917 P.2d 1078, 1078 (Utah 1996). Like the other cases cited by the majority, the case has a factual similarity to the extent that both involved a common owner, but *Jacobs* did not address the issue here: the effect of common ownership after prior property owners had acquiesced in a boundary for the requisite period of time.

**V. The Majority is Left Reyling Only on *Salazar*.**

A closer look at the cases relied on by the majority reveals that the "general law elsewhere" is not as the majority asserts it "appears" to be. The majority is left supported only by *Salazar*, a 4–3 decision whose holding leads to absurd results. *See* 911 P.2d at 1093 (Kourlis, J., dissenting) ("The effect of the majority's analysis is that the deed by which Mills Ranches obtained the Terry tract was based upon the fence line boundary, whereas the deed by which Mills Ranches conveyed the Terry tract to Jerry Mills on November 18, 1977 [(15 days later)], extinguished the fence line as the boundary, even though both of the deeds used the same general language.").

Even if the *Salazar* majority was convincing, following it still requires the majority to rewrite Iowa law. For these reasons, I respectfully dissent.